987 F.2d 494
 61 USLW 2547
 Paul E. OBERSTAR, individually and as an
institution-affiliated party of Boundary Waters
State Bank, Ely, Minnesota, Petitioner,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.
 Nos. 91-3844 and 92-2919.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 8, 1992.
Decided March 2, 1993.
 
 John F. Bonner, III, Minneapolis, MN (Kathryn J. Carlson, on the brief), for appellant.
 Daniel F. Ross and Marta W. Berkley, Washington, DC (Ann S. Duross, Asst. Gen. Counsel, Thomas A. Schulz, Asst. Gen. Counsel, Charles L. Cope, II, Sr. Counsel, and Colleen B. Bombardier, Sr. Counsel, on the brief), for appellee.
 Before BOWMAN and LOKEN, Circuit Judges, and HUNTER,* Senior District Judge.
 LOKEN, Circuit Judge.
 
 
 1
 Paul E. Oberstar appeals two Federal Deposit Insurance Corporation ("FDIC") decisions, one prohibiting him from participating in the affairs of any insured depository institution (the "Prohibition Order"), and the other ordering him to pay a $125,000 civil monetary penalty (the "Penalty Order"). Both orders are based upon Oberstar's alleged violation of the Change in Bank Control Act of 1978, 12 U.S.C. § 1817(j) (the "Control Act"). Having concluded that the Control Act was not violated, we reverse.
 
 
 2
 I. Factual and Procedural Background.
 
 
 3
 The Prohibition Order granted Enforcement Counsel's motion for summary disposition. The Penalty Order is a default judgment, entered after Oberstar filed an untimely answer to the agency's Notice of Assessment. Because of the summary nature of these adjudications, we take the facts asserted by Oberstar as true for purposes of his appeals.
 
 
 4
 In mid-1990, the Boundary Waters State Bank of Ely, Minnesota ("the Bank"), was in serious trouble. It was operating under two restrictive FDIC orders, a 1987 Cease and Desist Order and a 1988 Correction Order that included proposed termination of the Bank's deposit insurance. The Bank had held no shareholders' meeting since February 1988, despite an FDIC directive to hold such meetings and furnish adequate information to shareholders. The Bank's controlling shareholder, Craig Kronholm, was serving a five-year prison sentence for bank fraud, and a September 1988 FDIC prohibition order barred Kronholm from participating in the Bank's affairs.
 
 
 5
 In December 1988, Oberstar and his associate, James Peterson, had entered into a written agreement with Kronholm and his wife, Marcia, to buy the Kronholms' 84% of the Bank's outstanding shares. Pursuant to the Control Act, Oberstar and Peterson had notified the FDIC of their intention to acquire control of the Bank. On April 20, 1990, after a hearing, an FDIC Administrative Law Judge had recommended denial of the proposal, in part because Oberstar "lacks the competence and integrity to have a controlling voice in a troubled bank." Also in April 1990, the same ALJ had held a hearing on the FDIC's proposal to terminate the Bank's insurance.
 
 
 6
 Faced with these difficulties, the chairman of the Bank's board of directors, John Wavrin, concluded that the Bank needed to hold a shareholders' meeting. The Bank's bylaws required that a majority of the voting shares be present. Craig Kronholm obviously could not participate, so counsel for the Bank prepared the following document:
 
 APPOINTMENT OF PROXY
 
 7
 I, Craig Kronholm, being the joint-owner with Marcia Kronholm of 55,199 shares of common stock of the Boundary Waters State Bank, do hereby appoint either John Wavrin or Paul E. Oberstar as my proxy to attend all meetings of the stockholders of the Boundary Waters State Bank, with full power to vote and act for me in the same manner and extent that I might act, were I personally at said meetings.
 
 
 8
 My proxy shall have full power to substitute another person as my proxy, and to revoke the appointment of any such substitute proxy.
 
 
 9
 This proxy will be effective for one year from the date hereof, unless sooner revoked by written notice to the Secretary of the Boundary Waters State Bank.
 
 
 10
 At Wavrin's request, Oberstar got Craig Kronholm to sign this proxy on July 30, 1990. Marcia Kronholm signed a similar proxy two days later.[1]
 
 
 11
 A shareholders' meeting was held on August 6, 1990. Wavrin and Oberstar attended, and counsel for the Bank served as chairman of the meeting. The only significant action was the election of directors. The four incumbent directors were reelected, with Oberstar voting the Kronholm shares by proxy. Thus, neither the meeting nor Oberstar's use of the proxies affected the control or management of the Bank and its operations.
 
 
 12
 On August 28, 1990, the FDIC disapproved the Oberstar/Peterson Control Act request to acquire control of the Bank. Oberstar did not seek judicial review of this decision. On November 30, 1990, the FDIC issued its final order terminating the Bank's deposit insurance. The Bank closed its doors that day.
 
 
 13
 On March 6, 1991, the FDIC commenced these proceedings by issuing a "Notice of Intention to Prohibit from Further Participation," an administrative complaint urging that Oberstar be banished from the banking industry pursuant to 12 U.S.C. § 1818(e)(1) based upon his acceptance and vote of the Kronholm proxies at the August 6 shareholders' meeting. Oberstar answered and requested a hearing, and Enforcement Counsel moved for summary disposition. The same ALJ who had recommended denial of the Oberstar/Peterson Control Act application recommended that this administrative complaint be dismissed. The Board of Directors of the FDIC ("the Board") overruled the ALJ and entered a final decision prohibiting Oberstar "from participating in the conduct of the affairs of any insured depository institution."
 
 
 14
 Oberstar appealed the Prohibition Order to this court. See 12 U.S.C. § 1818(h)(2). Five days later, the FDIC filed a "Notice of Assessment of Civil Money Penalty." Oberstar timely requested a hearing. See 12 U.S.C. §§ 1817(j)(16)(F), 1818(i)(2)(H). He did not, however, file an answer within twenty days as required by the FDIC's regulations. See 12 C.F.R. § 308.19(a). When the ALJ's law clerk notified him of this oversight, Oberstar immediately filed an answer that was twenty-two days late under the regulation. FDIC Enforcement Counsel then moved for a default judgment. Accepting the ALJ's recommendation, the Board held that Oberstar had no good cause for his untimely answer under 12 C.F.R. § 308.19(c)(1), granted the motion for default judgment, and issued a final decision that Oberstar pay the $125,000 penalty sought in the Notice of Assessment. Oberstar appealed and we consolidated the two appeals. We now reverse both the Prohibition Order and the Penalty Order.
 
 
 15
 II. The Prohibition Order.
 
 
 16
 Federal bank regulatory agencies such as the FDIC have strong enforcement powers that were strengthened by Congress in the Financial Institutions Recovery, Reform and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 183 (1989) (FIRREA). These appeals challenge FDIC orders invoking two of the agency's most severe remedies, the power to prohibit an "institution-affiliated party"[2] from engaging in banking activities, and the power to impose substantial civil monetary penalties.
 
 
 17
 The FDIC's power to issue the Prohibition Order is found in 12 U.S.C. § 1818(e). Section 1818(e)(7), added by FIRREA, authorizes "industrywide prohibitions," such as this Prohibition Order, if the agency determines after a hearing that:
 
 
 18
 (A) [an] institution-affiliated party has, directly or indirectly--
 
 
 19
 (i) violated--(I) any law or regulation [or]
 
 
 20
 * * * * * *
 
 
 21
 (ii) engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution;
 
 
 22
 * * * * * *
 
 
 23
 (B) by reason of the violation, practice, or breach described in any clause of subparagraph (A)--
 
 
 24
 * * * * * *
 
 
 25
 (ii) the interests of the insured depository institution's depositors have been or could be prejudiced; or
 
 
 26
 (iii) such party has received financial gain or other benefit by reason of such violation, practice or breach; and
 
 
 27
 (C) such violation, practice, or breach--
 
 
 28
 * * * * * *(ii) demonstrates willful or continuing disregard by such party for the safety or soundness of such insured depository institution....
 
 
 29
 12 U.S.C. § 1818(e)(1). Thus, in order to impose this sanction, the FDIC must establish each of the three statutory criteria--"misconduct" under § 1818(e)(1)(A), "effect" under subparagraph (B), and "culpability" under subparagraph (C).
 
 
 30
 A. Misconduct.
 
 
 31
 The FDIC Board concluded that Oberstar's acceptance of the Kronholm proxies violated the Control Act and therefore constituted misconduct under § 1818(e)(1)(A)(i)(I). The Control Act provides:
 
 
 32
 No person ... shall acquire control of any insured depository institution through a purchase, assignment, transfer, pledge, or other disposition of voting stock ... unless the [FDIC] has been given sixty days' prior written notice ... and ... has not issued a notice disapproving the proposed acquisition.
 
 
 33
 12 U.S.C. § 1817(j)(1). Control is defined as "the power ... to vote 25 per centum or more of any class of voting securities." 12 U.S.C. § 1817(j)(8)(B). The FDIC's regulations do not define what constitutes an "other disposition of voting stock" for purposes of the Control Act but do specifically exempt "a customary one-time proxy solicitation." 12 C.F.R. § 303.4(c)(6).
 
 
 34
 The Board reasoned that Oberstar took control of the Bank when he accepted revocable one-year proxies that "placed virtually no limitation on the scope or purpose for which they could be used." The Board concluded "that the proxy is too broad on its face to fit within the [one-time proxy solicitation] exemption and therefore, there is no question of fact requiring a hearing." Ignoring the undisputed fact that the Bank's counsel, not Oberstar, drafted the proxies, the Board commented, "if [Oberstar] really intended that the proxies be for the one time purpose of providing a quorum at the annual shareholders' meeting, then they could have been drafted accordingly."
 
 
 35
 We conclude that the Board's decision is fundamentally inconsistent with the statute, which limits the Control Act to regulating a change in control "through a purchase, assignment, transfer, pledge, or other disposition of voting stock." In its analysis of the terms of the written proxies, the Board disregarded two key provisions that strongly refute the contention that these proxies effected either a change of control or a "disposition" of the Kronholms' voting stock.
 
 
 36
 First, the proxies were revocable. While there was no limitation on their use at a particular shareholders' meeting, if Oberstar had attempted to use them to effect a change in control, the Kronholms retained the unfettered power to revoke the proxies and reverse Oberstar's actions at a subsequent shareholders' meeting. As the ALJ noted in his recommended decision, "acquiring and exercising a revo[c]able proxy is not the same [as] owning a controlling interest in the Bank." The FDIC's disregard of this factor is particularly inexplicable given a December 29, 1980, FDIC Interpretive Letter which recommended that an inquiring party avoid a bank interlock problem by placing voting power in the hands of an undirected proxy; the letter stated that the proxy must be revocable "[s]o as not to constitute a change in control under [§ 1817(j) ]." 1980 FDIC Interp. Ltr. LEXIS 20.
 
 
 37
 Second, the Kronholm proxies appointed "either John Wavrin or Paul E. Oberstar" to vote the Kronholms' shares at one or more shareholders' meetings. We think it apparent that this limitation would have prevented Oberstar from using the proxies to effect a change in control without Wavrin's acquiescence. Wavrin's affidavits deny that a change in control was intended. Given these limiting provisions, we conclude that the FDIC erred in concluding from the face of the proxies that they effected a change in control of the Bank or an "other disposition"[3] of the Kronholms' stock.
 
 
 38
 When one looks beyond the face of the proxies to the events in question, the FDIC's contention that a Control Act violation was proved is unsustainable on this record. Wavrin has averred that the sole purpose of the proxies was to permit a shareholders' meeting that the Bank was required to hold to comply with prior FDIC directives. Oberstar has averred that he accepted the proxies as an accommodation to Wavrin and the Bank, at a time when he had decided to withdraw his pending application to acquire control because of likely FDIC disapproval. It is undisputed that the proxies were used only at the August 6 shareholders' meeting, when nothing happened other than the reelection of incumbent directors. Thus, although Oberstar had pending an application to acquire control of the Bank, there is simply no evidence that, by accepting the Kronholm proxies, he either intended to or did in fact effect an unapproved change in control.[4]
 
 
 39
 We do not hold that a person could never use a revocable proxy to "acquire control ... through a ... disposition of voting stock" in violation of the Control Act. The statute is broadly worded, as it must be given the problems Congress sought to address:
 
 
 40
 Banks were bought and sold like used cars and the regulators considered themselves powerless to do anything about what became known as the "Texas Rent-A-Bank Scheme."
 
 
 41
 For example, one individual acquired six banks in less than a year financed primarily with borrowed money. One of these banks ... was forced to close its doors because the new owner used the resources of the bank for self-dealing purposes. Other individuals and groups in the South and Southwest were discovered to be buying and selling banks in similar transactions.
 
 
 42
 H.R.Rep. No. 1383, 95th Cong., 2d Sess. 20 (1978), reprinted in 1978 U.S.S.C.A.N. 9273, 9292. Depending upon the circumstances, a revocable proxy could be the kind of "other disposition" of voting stock that covertly effects a change in control. Thus, the FDIC's assertion on appeal that Oberstar "did indirectly by proxy what he was prohibited from doing directly" might be a sound argument had Enforcement Counsel proved the underlying premise at an evidentiary hearing. But this allegation is unsupported, indeed it is totally refuted, by the record before us. Oberstar was no doubt imprudent in accepting the proxies as an accommodation to the Bank when his Control Act application was pending, but on this record he did not violate the Control Act.
 
 
 43
 The FDIC argues on appeal that Oberstar violated the Control Act because the proxies do not fit the agency's definition of a "customary one-time proxy" in 12 C.F.R. § 303.4(c)(6). Though we must uphold any reasonable FDIC interpretation of the Control Act, see Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 864-66, 104 S.Ct. 2778, 2792-93, 81 L.Ed.2d 694 (1984), we conclude that it does unacceptable violence to the plain language of the statute for the agency to create narrow classes of "exempt transactions" and then hold that all other transactions are automatically covered. See I.C.C. v. American Trucking Ass'ns, Inc., 467 U.S. 354, 363, 104 S.Ct. 2458, 2463, 81 L.Ed.2d 282 (1984) (deference to an agency's reading of statutory language is unwarranted when the agency's interpretation is unsupported by a natural reading of the provision). As applied in this case, the FDIC's construction effectively reads the limiting phrase, "through a ... disposition of voting stock," out of the statute.[5] Given the undisputed evidence demonstrating that the proxies effected neither a change in control nor a disposition of the Kronholms' voting stock, the FDIC's determination that Oberstar violated the Control Act is without support.
 
 
 44
 The Board also concluded that Oberstar engaged in misconduct by committing an "unsafe or unsound practice." See 12 U.S.C. § 1818(e)(1)(A)(ii). Unsafe and unsound banking practices are defined as "conduct deemed contrary to accepted standards of banking operations which might result in abnormal risk or loss to a banking institution or shareholder." First Nat'l Bank of Eden v. Department of the Treasury, 568 F.2d 610, 611 n. 2 (8th Cir.1978). Here, the Board concluded "that when one acquires control of an institution in spite of a previous denial of such control under the [Control Act] for lack of competence and integrity, such conduct is, by definition, an unsafe or unsound act." Since the Board's premise--that Oberstar acquired control through the Kronholm proxies--was incorrect, its ultimate conclusion cannot be sustained. And there is simply no other evidence that Oberstar's conduct in attending the August 6 shareholders' meeting and voting the Kronholm shares to reelect incumbent directors resulted in an "abnormal risk or loss" for the Bank.
 
 
 45
 B. Effect and Culpability.
 
 
 46
 Because we conclude that the FDIC failed to prove misconduct under § 1818(e)(1)(A), the Prohibition Order must be reversed. In addition, we reject the agency's conclusions that the statutory criteria of effect and culpability were proved as a matter of law.
 
 
 47
 At most, the record supports a technical violation of the Control Act--the benign use at one shareholders' meeting of proxies that the Bank's counsel drafted too broadly to qualify as an exempt transaction under the agency's regulations. The Board held that Oberstar's acceptance of the proxies had the requisite adverse effect in part because Oberstar received an "other benefit"--the control he sought to acquire in his pending Control Act application.[6] See 12 U.S.C. § 1818(e)(1)(B)(iii). The Board also reasoned that Oberstar demonstrated the requisite culpability because he took control of the Bank knowing that his proposed acquisition had been preliminarily denied.
 
 
 48
 This reasoning ignores the remedial safeguards Congress carefully built into the statute. Proof of misconduct alone entitles the agency to invoke its broad Cease and Desist enforcement powers. See 12 U.S.C. § 1818(b). The more severe sanction of a Prohibition Order may only be imposed if the misconduct was more than inadvertent or technical, that is, if it had the requisite adverse effect and if the violator was guilty of "personal dishonesty" or "willful or continuing disregard" for the safety or soundness of the bank.
 
 
 49
 As to effect, we agree with the ALJ--the FDIC's assertion that Oberstar received an "other benefit" by acquiring the proxies "is not derived from any facts." Obtaining effective control of a financial institution is no doubt a benefit. Voting proxies to reelect incumbent directors as an accommodation to the Bank, with no intent to take control, is not. The agency argues that the first occurred but offers no supporting facts to refute Oberstar's affidavits tending to prove that he neither sought nor received a benefit. Summary disposition resolving this factual issue against Oberstar was clearly inappropriate.
 
 
 50
 Turning to the culpability standard, in Brickner v. FDIC, 747 F.2d 1198, 1203 n. 6 (8th Cir.1984), the FDIC conceded that it must prove "some scienter" to establish culpability. There are many types of misconduct that, by their very nature, evidence willful disregard for a bank's safety or soundness, such as the check-kiting scheme at issue in Van Dyke v. Board of Governors, 876 F.2d 1377 (8th Cir.1989). However, attending a shareholders' meeting and voting a revocable proxy to reelect incumbent directors is not inherently contrary to accepted standards of banking nor abnormally risky for the Bank.
 
 
 51
 The FDIC argues that Oberstar's conduct was inherently culpable--he took control of the Bank knowing that his Control Act application had been preliminarily denied because he was found to lack the necessary competence and integrity. However, Oberstar denies intending to take control, taking effective control, or violating the Control Act. And those denial are plausible--in other words, assuming for the moment that the Control Act was violated, the facts suggest that any violation was technical or inadvertent. In these circumstances, the FDIC may not summarily impose the crippling sanction of a prohibition order. To meet its statutory obligations, it must hold an evidentiary hearing and make a finding supported by substantial evidence that Oberstar willfully disregarded the Bank's safety and soundness. Such a finding cannot be sustained on this record.
 
 
 52
 We therefore conclude that the FDIC's Prohibition Order must be reversed because it was "unwarranted in law [and] without justification in fact," Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 185-86, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973).
 
 
 53
 III. The Penalty Order.
 
 
 54
 On December 31, 1991, five days after Oberstar appealed the Prohibition Order, the FDIC issued a Notice of Assessment of a $125,000 civil monetary penalty against Oberstar, based on his acceptance of the Kronholm proxies. On February 27, 1992, while Oberstar's timely request for a hearing was pending, the FDIC filed a motion for default judgment because Oberstar filed his answer twenty-two days late under the agency's procedural regulations. The Board granted this motion and awarded the full relief sought in the administrative complaint on the sole ground that Oberstar had failed to show "good cause" for his tardy answer. We conclude that the Penalty Order was an abuse of the agency's discretion for each of the following reasons.
 
 
 55
 A. The Notice of Assessment charged that, by accepting the Kronholm proxies, Oberstar had violated the Control Act and had violated § 1818(e)(6)(B) by aiding and abetting a violation of Kronholm's September 1988 prohibition order.[7] Thus, the civil penalty proceeding sought to impose an additional sanction for the same conduct sanctioned in the Prohibition Order.
 
 
 56
 After Oberstar filed his notice of appeal, the FDIC could not have revisited its Prohibition Order and increased the sanctions without leave of this court, because we had acquired jurisdiction. Although the agency gave the Notice of Assessment a different docket number, that was but a thinly-disguised attempt to avoid the jurisdiction and supervision of this court. Moreover, the inference that the money penalty proceeding was commenced to punish Oberstar for seeking judicial review of the Prohibition Order is deeply disturbing.[8] We conclude that the agency abused its discretion in commencing the money penalty proceeding and prosecuting it to a default judgment, without leave of this court, while judicial review of the Prohibition Order was pending.
 
 
 57
 B. We have frequently endorsed the strong judicial policy against default judgments. See, e.g., Marshall v. Boyd, 658 F.2d 552, 554 (8th Cir.1981). Applying this policy, we recently held that a district court abused its discretion by entering a default judgment "for a marginal failure to comply with the time requirements." United States v. Harre, 983 F.2d 128, 129-30 (8th Cir.1993). The twenty-two day delay at issue here obviously did not prejudice the agency, and there is no evidence of willful procedural misconduct by Oberstar. Consequently, if a district court had entered a default judgment in this situation, our decision to reverse would require only minimal discussion.
 
 
 58
 The FDIC argues, however, that it may apply its own procedural rules, which require entry of a default judgment "[u]pon a finding that no good cause has been shown for the failure to file a timely answer." 12 C.F.R. § 308.19(c)(1). Although it is true that "agencies should be free to fashion their own rules of procedure," Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc., 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978), those regulations must be "reasonably related to the purposes of the enabling legislation." Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973). The statute provides that a respondent who makes a timely hearing request, as Oberstar did, "shall be afforded an agency hearing." 12 U.S.C. § 1818(i)(2)(H). Implicit in that is a mandate that the hearing be fundamentally fair. "Though the FDIC is free to establish necessary procedural mechanics, it may not give less than what Congress chooses to grant." Amberg v. F.D.I.C., 934 F.2d 681, 687 (5th Cir.1991).
 
 
 59
 The judicial preference for adjudication on the merits goes to the fundamental fairness of the adjudicatory process. Fairness concerns are especially important when a government agency proposes to assess a quasi-criminal monetary penalty on a private individual. By entering the default judgment against Oberstar because of his minor deviation from the FDIC's procedural rule, with no showing of prejudice to the agency, the Board unfairly deprived Oberstar of his right to a statutorily-mandated hearing. We hold that the Board's application of the FDIC default regulation in this case was an abuse of its discretion.
 
 
 60
 Even if we applied the FDIC's default regulation to this case, we disagree with the Board's conclusion that Oberstar failed to show good cause for his marginally untimely answer. Oberstar's attorney filed an affidavit, stating:
 
 
 61
 5. I filed a Request for Hearing ... on behalf of Mr. Oberstar. I delayed the filing of the Answer because the FDIC knew Mr. Oberstar's position and because I thought it prudent to delay the expense incurred in drafting a responsive pleading until we received word that this proceeding would in fact go forward. I felt it very likely that this action would be continued until the Eighth Circuit ruled. For that reason, filing an answer seemed an unnecessary expense.
 
 
 62
 Given the unfair harassment inherent in the FDIC commencing this second proceeding while judicial review of the Prohibition Order was pending, Oberstar's attorney acted reasonably in not answering until an answer was requested by the ALJ. This is good cause for the marginally late filing, and the Board abused its discretion in concluding otherwise.
 
 
 63
 C. In FIRREA, Congress greatly expanded the FDIC's power to impose civil monetary penalties but incorporated safeguards to ensure that excessive penalties are not assessed. The amount of penalty that may be assessed is affected by whether the agency finds a "first tier," "second tier," or "third tier" violation. See 12 U.S.C. § 1818(i)(2)(A)-(C). In determining the amount of the penalty, the agency "shall take into account" mitigating factors including the financial resources and good faith of the respondent, the gravity of the violation, the history of previous violations, and "such other matters as justice may require." See 12 U.S.C. § 1818(i)(2)(H).
 
 
 64
 In imposing civil monetary penalties, the FDIC must "properly consider the evidence in relation to the appropriate statutory factors." Dazzio v. F.D.I.C., 970 F.2d at 77. Here, the Board's Penalty Order totally ignores these factors; it simply enters default judgment in the amount requested in the Notice of Assessment. The entry of default judgment does not permit the agency to avoid its statutory obligations.[9] Therefore, even if the Board's entry of a default judgment was appropriate, we would not uphold imposition of the $125,000 fine.
 
 
 65
 D. Because we have reversed the Prohibition Order, the FDIC is barred by the doctrine of res judicata from imposing the Penalty Order. See Tate v. Western Md. Ry., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405 (1933); Anselmo v. Hardin, 253 F.2d 165 (3d Cir.1958). This doctrine applies even as to the theory not asserted in the Prohibition Order proceeding--that Oberstar violated § 1818(e)(6)(B) by aiding and abetting a violation of Kronholm's prohibition order:
 
 
 66
 [W]here a plaintiff fashions a new theory of recovery or cites a new body of law that was arguably violated by a defendant's conduct, res judicata will still bar the second claim if it is based on the same nucleus of operative facts as the prior claim.
 
 
 67
 Lane v. Peterson, 899 F.2d 737, 744 (8th Cir.), cert. denied, 498 U.S. 823, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990).
 
 
 68
 The FDIC's November 26, 1991, Decision and Order in FDIC-91-193 and its August 4, 1992, Decision and Order to Pay in FDIC-91-154k are reversed.
 
 
 
 *
 The HONORABLE ELMO B. HUNTER, Senior United States District Judge for the Western District of Missouri, sitting by designation
 At the time they signed their proxies, the Kronholms also signed a Reaffirmation and Extension Agreement giving Oberstar the right to transfer his interest in the December 1988 stock purchase agreement. Peterson intended to infuse the Bank with needed additional capital as part of taking control, but he had no bank management experience. Because it appeared that the ALJ's challenge to Oberstar's competence and integrity would lead to a denial of the Oberstar/Peterson Control Act application, the intent was to replace Oberstar with another experienced banker to obtain FDIC approval of a change in control. Instead, the Bank closed.
 
 
 [2]
 This term is broadly defined in the FDIC Act and clearly includes Oberstar. See 12 U.S.C. § 1813(u)
 
 
 [3]
 "It is a familiar principle of statutory construction that words grouped in a list should be given related meaning." Third Nat'l Bank in Nashville v. Impac Ltd., Inc., 432 U.S. 312, 322, 97 S.Ct. 2307, 2313, 53 L.Ed.2d 368 (1977). Thus, for purposes of the Control Act, an "other disposition" of voting stock must be a transaction that resembles in effect a "purchase, assignment, transfer, [or] pledge." In most situations, a revocable proxy given in connection with a routine shareholders' meeting is not such a transaction
 
 
 [4]
 The FDIC itself has properly stated that the Control Act is directed at persons "seeking to acquire control" of an insured depository institution. See Changes in Control in Insured Nonmember Banks, 44 Fed.Reg. 7226 (1979) (emphasis added)
 
 
 [5]
 "A statute must, if possible, be construed in such a fashion that every word has some operative effect." United States v. Nordic Village, --- U.S. ----, ----, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992)
 
 
 [6]
 The Board also found that "the interests of ... depositors ... could be prejudiced" by Oberstar's Control Act violation. 12 U.S.C. § 1818(e)(1)(B)(ii). We need not consider this issue
 
 
 [7]
 This theory was not advanced by the agency in the Prohibition Order proceeding, and for good reason. The Bank believed that it was obligated by two FDIC compliance orders to hold shareholder meetings. Under this theory, anyone who assisted the Bank in holding such meetings by making Kronholm's controlling shares eligible to participate would be subject to a $125,000 fine. The unfairness of such a regulatory position is apparent. It is also inconsistent with the FDIC's statement at oral argument on the appeal of the Prohibition Order that the Bank should have enlisted the aid of "someone, anyone other than Paul Oberstar" to get the Kronholm proxies
 
 
 [8]
 We are concerned that this was not an isolated occurrence. See Dazzio v. F.D.I.C., 970 F.2d 71, 79 (5th Cir.1992) (increased penalty after judicial remand "looks to us uncomfortably like judicial vindictiveness")
 
 
 [9]
 Even in civil litigation between private parties, a party entitled to judgment by default is required to prove the amount of damages that should be awarded. See Fed.R.Civ.P. 55(b)(2). Such a safeguard is all the more essential when the sovereign declares a default and imposes a quasi-criminal fine against a party that has attempted to assert his right to a hearing