Billy **PROFFITT**, Petitioner,

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION,** Respondent.

No. 98–1534.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1999.

Decided Jan. 21, 2000.

Frank J. Eisenhart argued the cause for the petitioner. Arthur W. Leibold, Jr. entered an appearance.

Jack D. Smith, Deputy General Counsel, Federal Deposit Insurance Corporation, argued the cause for the respondent. Christopher J. Bellotto and Lawrence H. Richmond, Counsel, Federal Deposit Insurance Corporation, were on brief.

Robert B. Serino, L. Robert Griffin and Douglas B. Jordan, Counsel, United States Department of Treasury, were on brief for amicus curiae.

Before: SILBERMAN, GINSBURG and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

Dissenting Opinion filed by Circuit Judge SILBERMAN.

KAREN LeCRAFT HENDERSON, Circuit Judge:

In 1998 the Federal Deposit Insurance Corporation (FDIC) removed Billy Proffitt as director of Tennessee State Bank of Gatlinburg, Tennessee (Bank) and prohibited him from further participation in the banking industry. The FDIC acted pursuant to its removal authority under section 8(e), 12 U.S.C. § 1818(e), of the Federal Deposit Insurance Act (FDI Act), 12 U.S.C. §§ 1811 *et seq.* It ruled that 28 U.S.C. § 2462, which imposes a five-year statute of limitations on "an action . . . for the enforcement of any . . . penalty," does not limit a section 8(e) removal and prohibition action because the sanction is remedial, not punitive. Relying on *Johnson v. SEC,* 87 F.3d 484, 488 (D.C.Cir.1996), which defined "penalty" as used in section 2462 as any "punishment imposed by the government for unlawful or proscribed conduct, going beyond compensation of the wronged party," we conclude that the FDIC's section 8(e) removal action imposes a penalty and therefore triggers the five-year statute of limitations. We also conclude that the limitations period can be triggered separately under section 8(e)'s alternative "effects" language and therefore the FDIC's action was timely because it was brought within five years of when the Bank "suffered financial loss." 12 U.S.C. § 1818(e)(1)(B)(i). Finally, because the FDIC's section 8(e) removal and prohibition order imposes a penalty, due process does not require the FDIC to consider Proffitt's current competence or risk to the public *vel non.* Accordingly, we deny Proffitt's petition for review.

## I.

Proffitt was the majority shareholder of Tennessee State Bancshares, Inc., a holding company which, in turn, is the majority shareholder of the Bank. Proffitt, a co-founder of the Bank, served as its director from the date it was chartered in 1971 until the FDIC removed him in 1998. In July 1989 Charles and Nancy Boling, customers of the Bank who were in the motel business in Gatlinburg at the time, approached Bank president Tommy Bush to discuss a loan to purchase the Glenstone Lodge (Lodge), a hotel which was then in bankruptcy. The Bolings requested complete confidentiality about the loan and all information they furnished to the Bank. *See* Findings of Fact, Chancery Court for Sevier County, TN 3 (Feb. 17, 1992). They specifically expressed concern that some members of the Bank's board of directors (Board) who were also in the motel business might be interested in bidding on the Lodge. *See id.* Bush promised the Bolings that no director who had an interest in purchasing the Lodge would see any of the information they provided or participate in the consideration of their application for a loan. *See id.* at 3–4. A few days after their initial meeting, Bush informed the Bolings that he had checked with the Board and no member was interested in buying the Lodge. The Bolings then applied for a $4.5 million loan and provided the Bank with financial information, including their personal financial statements and detailed projections of income and expenses for operation of the Lodge. *See id.* at 4. The Bank Board authorized Bush to investigate whether additional financing could be obtained from other lenders since the requested loan amount exceeded the Bank's $1.5 million loan-to-one-borrower limit. These efforts failed and, after several months, Bush stopped looking for additional loan funds, although the Bolings remained interested in buying the Lodge. *See* Administrative Law Judge's (ALJ) Recommended Decision 14 (Feb. 12, 1998).

In December 1989, unknown to the Bolings, Proffitt joined the Foley Group, a group of investors interested in acquiring the Lodge. At the time, Proffitt advised Bush only that he was considering joining the Foley Group. In early 1990 Proffitt participated with the Foley Group in submitting several unsuccessful offers to purchase the Lodge from the bankruptcy trustee. At least one other member of the Bank Board was at that time aware of Proffitt's participation in the Foley Group. *See* Proffitt's Statement of Disputed and Omitted Facts 4 (Aug. 4, 1997).

Meanwhile, in January 1990 the Bolings submitted a revised loan request to the Bank. Bush considered the Bolings' request a new package because they requested only a $4 million loan package (with the Bank continuing to provide $1.5 million) and offered different primary collateral. On March 7, 1990 the Bank Board, including Proffitt, met to formally consider the Bolings' loan request. Bush asked any Board member who was interested in purchasing the Lodge to leave the room. Proffitt failed to leave the room or disclose his conflicting interest in the Foley Group. Bush then distributed the Bolings' confidential information to each Board member. The Bank Board, including Proffitt, unanimously approved the Bolings' loan package. On March 12, 1990 the Bank issued a written loan commitment to the Bolings in the amount of $1.5 million.

The foreclosure sale of the Lodge was scheduled to be held on March 30, 1990. On March 27, 1990 Charles Boling went to Bush's office and advised him that a Kentucky bank had informally approved a participating loan for the additional amount needed. Proffitt, who was in Bush's office at the time, listened to the discussion between Boling and Bush, including Boling's strategy for bidding at the auction. *See* FDIC's Decision and Order 4 (Oct. 6, 1998). Because the Lodge was subject to a $100,000 tax lien, Boling told Bush that $3.4 million was their top bid. After Boling left Bush's office, Proffitt informed Bush of his Foley Group connection. Bush told Proffitt to inform the Bolings of his

conflict but he did not do so. On March 30, 1990 the foreclosure sale of the Lodge took place. The first mortgagee, the Foley Group and the Bolings were the only bidders. The Bolings bid their maximum of $3.4 million. The Foley Group then bid $3.405 million and acquired the Lodge.

That night the Bolings learned for the first time that Proffitt belonged to the Foley Group. In July 1990 they filed a lawsuit against the Bank, Proffitt and Bush, alleging *inter alia* breach of fiduciary duty and fraud. In February 1992 the state trial court entered judgment against Proffitt and the Bank. In August 1993 the Tennessee Court of Appeals reversed the trial court's judgment, concluding that Proffitt's fraud had not caused the Bolings any damage.[1] *See Boling v. Tennessee State Bank*, 1993 WL 305824 (Tenn. Ct. App. Aug.11, 1993). In November 1994 the Tennessee Supreme Court reversed the intermediate appellate court's decision, *see Boling v. Tennessee State Bank*, 890 S.W.2d 32 (Tenn.1994), and reinstated the judgment against Proffitt for fraud because he willfully violated his fiduciary duties. The court reduced the compensatory damages award to $14,825 (representing the Bolings' costs of bid preparation) against the Bank and Proffitt jointly and upheld the $250,000 punitive damages award against the Bank and the punitive damages award in the same amount against Proffitt.

On December 18, 1996, more than six years after Proffitt's actions, the FDIC issued a Notice of Intention to Remove from Office and to Prohibit from Further Participation (Removal and Prohibition Notice), charging Proffitt with "violations of law, unsafe or unsound banking practices, and/or ... breaches of fiduciary duty." Removal and Prohibition Notice 1 (Dec. 18, 1996). In response to Proffitt's motion for summary disposition, the ALJ found that Proffitt had violated section 8(e)[2] and recommended that Proffitt be removed from membership on the Bank Board and prohibited from further participation in the banking business. *See* ALJ's Proposed Order 19–20 (Feb. 12, 1998). The ALJ rejected Proffitt's assertion that the FDIC's removal and prohibition action was barred by the five-year statute of limitations prescribed in 28 U.S.C. § 2462 (section 2462).[3] The ALJ found section 2462 inapplicable because it conflicts with the six-year limitations period imposed by 12 U.S.C. § 1818(i)(3).[4] *See* ALJ's Recommended Decision 2 (Feb. 12, 1998). On October 6, 1998 the FDIC af-

---

1. Because the court determined that Proffitt had not damaged the Bolings, it also concluded that the Bank was not liable.

2. Section 8(e) authorizes the FDIC to remove a "party from office or to prohibit any further participation ... in the conduct of the affairs of any insured depository institution"
   (1) [w]henever [it] determines that—
   (A) any institution-affiliated party has, directly or indirectly—
   (i) violated
   (I) any law or regulation;
   ....
   (B) by reason of the violation, practice, or breach described in any clause of subparagraph (A)—
   (i) such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage;
   (ii) the interests of the insured depository institution's depositors have been or could be prejudiced; or

(iii) such party has received financial gain or other benefit by reason of such violation, practice, or breach; and
   (C) such violation, practice, or breach–
   (i) involves personal dishonesty on the part of such party; ....
12 U.S.C. § 1818(e).

3. 28 U.S.C. § 2462 provides:

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

4. 12 U.S.C. § 1818(i)(3) provides:

The resignation, termination of employment or participation, or separation of an institu-

firmed the ALJ's removal and prohibition decision but determined that section 2462 was inapplicable for a different reason, namely, that a "removal and prohibition action is intrinsically remedial ... and can be brought 'whenever' the statutory conditions are satisfied." FDIC's Decision and Order 16 (Oct. 6, 1998). The removal order went into effect on November 5, 1998. Proffitt petitions this court for review.

## II.

Our standard of review comes from the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(E). "Applying the standards set forth in the Administrative Procedure Act ... we will set aside the [FDIC's] factual findings only if unsupported by substantial evidence on the record as a whole, 5 U.S.C. § 706(2)(E) (1994); we will set aside the [FDIC's] legal conclusions only if 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' *id.* § 706(2)(A)." *Pharaon v. Board of Governors of Fed. Reserve Sys.*, 135 F.3d 148, 152 (D.C.Cir. 1998); *see also* 12 U.S.C. § 1818(h) (2) (APA applies to section 8(e) proceeding). When a statute is administered by more than one agency, a particular agency's interpretation is not entitled to *Chevron* deference. *See Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 643 n. 30, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (because multiple agencies promulgated rules under statute, "there is thus not the same basis for deference predicated on expertise as we found" in *Chevron*); *Salleh v. Christopher*, 85 F.3d 689, 692 (D.C.Cir.1996) (no *Chevron* deference applied to agency's interpretation of statute it administers

"when more than one agency is granted authority to interpret the same statute"). "Because § 2462 is a statute of general applicability rather than one whose primary administration has been delegated to the [FDIC], we interpret it *de novo.*" *Johnson,* 87 F.3d at 486 (citation omitted).

Proffitt argues that the FDIC's section 8(e) removal and prohibition action imposes a penalty and is therefore barred by section 2462's five-year statute of limitations because the FDIC's claim "first accrued" in 1990 but it failed to take action until 1996. The FDIC responds that section 2462 does not apply to a section 8(e) removal and prohibition action because the action is remedial. In the alternative, the FDIC argues that it moved against Proffitt within five years of when the Bank "suffered financial loss" under section 8(e)(1)(B)(i). 12 U.S.C. § 1818(e)(1)(B)(i).

### A. Section 8(e) action imposes penalty

In *3M Co. v. Browner,* 17 F.3d 1453, 1457 (D.C.Cir.1994), the court held that section 2462 applies to any administrative proceeding " 'for the enforcement of' a civil penalty." In *3M* the Environmental Protection Agency (EPA) assessed civil fines against the 3M company eight years after the company was found to have first violated the Toxic Substances Control Act. The court held that section 2462 limited the civil fines and penalties to those violations occurring within five years of the EPA's action. More recently, in *Johnson v. SEC,* 87 F.3d 484, 491 (D.C.Cir. 1996), we defined a section 2462 penalty as a sanction used to punish an individual "for unlawful or proscribed conduct, going beyond compensation of the wronged party."[5]

tion-affiliation party (including a separation caused by the closing of an insured depository institution) shall not affect the jurisdiction and authority of the appropriate Federal banking agency to issue any notice and proceed under this section against any such party, if such notice is served before the end of the 6–year period beginning on the date such party ceased to be such a party with respect to such depository institution.

5.  The Office of the Comptroller of the Currency (OCC) as amicus urges the court to recon-

sider *3M* and *Johnson* in light of the Supreme Court's holding in *Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). In *Hudson* the Court overturned its decision in *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), holding that the double jeopardy clause applies only to criminal cases. *3M,* however, does not employ *Halper's* reasoning. Furthermore, in *Johnson* we explicitly rejected the argument that section 2462's penalty test is the double jeopardy punishment test, noting

There we concluded that the Securities and Exchange Commission's six-month license suspension of Johnson, a stock broker, imposed a penalty within section 2462 because the suspension went "beyond compensation of the wronged party" and because the SEC had not focused on Johnson's current competence or risk to the public. *Id.* The FDIC distinguishes *Johnson,* contending that its expulsion of Proffitt is remedial because it is a *permanent* suspension designed to protect the public, unlike the SEC's temporary suspension of Johnson. Nevertheless, as *Johnson* noted, "[i]t is clearly possible for a sanction to be 'remedial' in the sense that its purpose is to protect the public, yet not be 'remedial' because it imposes a punishment going beyond the harm inflicted by the defendant." *Id.* at 491 n. 11 (citing *In re Ruffalo,* 390 U.S. 544, 550, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968)). Although the FDIC's expulsion of Proffitt from the banking industry had the dual effect of protecting the public from a dishonest banker and punishing Proffitt for his misconduct, its punitive purpose plainly goes "beyond compensation of the wronged party." *Id.* at 488.

That the expulsion sanction is punitive is further manifested by the fact that the FDIC did not act for more than six years after Proffitt's misdeeds. *See id.* at 490 n. 9 ("If the [agency] really viewed [the defendant] as a clear and present danger to the public, it is inexplicable why it waited *more than five years* to begin the proceedings to suspend her.") (emphasis in original). The FDIC could have taken action as early as 1990 under the "will probably suffer" language of section 8(e)(1)(B)(i) or perhaps under section 8(e)(1)(B)(ii), asserting "the interests of the insured depository institution's depositors ... could be prejudiced." The FDIC admits that it monitored the Bolings' lawsuit after it was filed in July 1990 and was aware of Proffitt's actions at that time through newspaper reports. *See* FDIC's Opp. Br. to Summary Disposition 1–2 (Aug. 1, 1997). The FDIC might have determined in 1990 that, because of Proffitt's actions, the Bank "probably will suffer financial loss" as a result of an adverse verdict or settlement or at least that Proffitt "received financial gain or other benefit." 12 U.S.C. § 1818(e)(1)(B)(iii). If in fact Proffitt posed the threat to the public that the FDIC portrays, it presumably would have removed him sooner rather than later. Instead, it held off for six years with Proffitt participating in the Bank's business all the while.

The FDIC's position is further undermined by the focus of its proceeding. In *Johnson,* we noted that a "sanction would less resemble punishment if the [agency]

that the test for punishment "in various constitutional contexts" does "not control the question of whether license suspension is a penalty for purposes of § 2462." *Johnson,* 87 F.3d at 491.

Nevertheless, the FDIC argues that three other Supreme Court cases equate the double jeopardy punishment test and the section 2462 penalty test. *See Rex Trailer Co. v. United States,* 350 U.S. 148, 149 n. 2, 76 S.Ct. 219, 100 L.Ed. 149 (1956); *United States v. Hougham,* 364 U.S. 310, 313, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960) (following *Rex Trailer*); *Koller v. United States,* 359 U.S. 309, 79 S.Ct. 755, 3 L.Ed.2d 828 (1959) (*per curiam* decision following *Rex Trailer*). In *Rex Trailer* the company was criminally fined for fraudulently purchasing motor vehicles. The United States then sued the company civilly for the same actions. The company challenged the civil penalties as violative of the double jeop-

ardy clause. The lower court held that the monetary relief sought was civil in nature and therefore did not violate the double jeopardy clause. The Supreme Court granted certiorari to resolve a circuit conflict over whether the civil sanction (monetary relief) also constituted a penalty under section 2462. The Court held that the monetary sanction was "civil in nature" and therefore not barred by the double jeopardy clause but the Court did not expressly address section 2462. *Rex Trailer,* 350 U.S. at 151, 76 S.Ct. 219. The FDIC argues that the Court thus equated the double jeopardy punishment and section 2462's tests. We disagree. Although in *Rex Trailer* the Supreme Court may have implicitly recognized a connection between the double jeopardy punishment test and the section 2462 penalty test, the Court did not indicate that the two tests are identical.

had focused on Johnson's current competence or the degree of risk she posed to the public." *Id.* at 489. The FDIC, however, based its action solely on Proffitt's long past conduct and made no attempt to evaluate his present fitness or competence. It counters that Proffitt had ample opportunity to present any information he desired regarding his current competence but failed to do so. The FDIC's argument might carry more weight if it had given Proffitt notice that his current competence and/or risk was at issue. Instead, its notice focused solely on Proffitt's prior conduct.[6] *See* Removal and Prohibition Notice 10–11 ¶ ¶ 32–37. While a serious offense, even long past, may indicate Proffitt's current risk to the public, that offense cannot alone determine his fitness almost a decade later. *See 3M,* 17 F.3d at 1457 ("In a country where not even treason can be prosecuted, after a lapse of three years, it could scarcely be supposed that an individual would remain for ever liable to a pecuniary forfeiture.") (quoting *Adams v. Woods,* 6 U.S. (2 Cranch) 336, 341, 2 L.Ed. 297 (1805) (Marshall, C.J.)).

■ Finally, the FDIC argues that the six-year limitations period imposed by section 1818(i)(3), *see supra* n. 4, indicates that the Congress did not intend section 2462's five-year period to apply to section 8(e) proceedings. Section 2462 limits any "action, suit or proceeding for the enforcement of any ... penalty" but also states "[e]xcept as otherwise provided by Act of Congress." Both the ALJ and the FDIC concluded that section 1818(i)(3) fits the exception. We disagree. In *CityFed Fin. Corp. v. OTS,* 58 F.3d 738, 743 (D.C.Cir. 1995), we held that section 1818(i)(3) was enacted "solely to address the effects of ... *Stoddard v. Board of Governors,* 868 F.2d 1308 (D.C.Cir.1989)." In *Stoddard,* the court had held that banking regulatory agencies lost enforcement jurisdiction over individuals who left the industry. Then, the Congress enacted section 1818(i)(3) as

part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, to ensure that, so long as the agency acted within six years of his departure, a banker could not avoid sanctions by simply severing his ties with a financial institution. Thus, section 1818(i)(3) was not intended to preempt section 2462 but instead to clarify the jurisdiction of banking regulatory agencies to pursue fleeing bankers. Nor is the application of section 2462 to section 8(e) proceedings inconsistent with section 1818(i)(3). Contrary to the FDIC's assertion, application of both section 2462 and section 1818(i)(3) to a section 8(e) proceeding does not treat a banker who leaves an institution more harshly than one who remains with the institution. Section 1818(i)(3) limits the FDIC's *jurisdiction* over a former banker to six years after he leaves the industry while section 2462 requires that any action imposing a civil penalty against any banker, regardless whether he has left the industry, must be initiated no later than five years from the date the claim "first accrue[s]".

*B. Section 2462 accrual*

■ Having concluded that section 2462 applies to the FDIC's section 8(e) proceeding, we must now determine when the five-year limitations period began to run, *i.e.,* when the claim accrued. "A claim normally accrues when the factual and legal prerequisites for filing suit are in place." *3M,* 17 F.3d at 1460 (citations omitted). A section 8(e) removal and prohibition action has three prongs: misconduct, effect and culpability. *See Oberstar v. FDIC,* 987 F.2d 494, 500 (8th Cir.1993) ("In order to impose [section 8(e)(1)'s] sanction, the FDIC must establish each of the three statutory criteria—'misconduct' under § 1818(e)(1)(A), 'effect' under subparagraph (B), and 'culpability' under subparagraph (C)."); *see also Pharaon,* 135 F.3d at 157 (adopting *Oberstar*'s "so-called ef-

---

6. Moreover, if, as the FDIC maintains, Proffitt's current competence was in fact at issue, he was entitled to fair notice and an opportu-
nity to be heard. *See Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). The FDIC failed to provide it.

fects prong"); *Cousin v. OTS*, 73 F.3d 1242, 1247 (2d Cir.1996) ("These three subsections . . . have come to be known as the (1) 'misconduct,' (2) 'effect,' and (3) 'culpability' prongs of the prohibition test."); *Grubb v. FDIC*, 34 F.3d 956, 961 (10th Cir.1994); *Seidman v. OTS*, 37 F.3d 911, 929 (3d Cir.1994). Because misconduct and effect are separate prongs, the underlying conduct may not always immediately effect a section 8(e) violation and thus the accrual of the claim. The same misconduct can produce different effects at different times, resulting in separate section 8(e) claims and separate accruals. As the court recognized in *3M*, the question of accrual "becomes complex where considerable time intervenes" between the underlying conduct and the harmful effect. *3M*, 17 F.3d at 1460.

Section 8(e) expressly gives options to the FDIC. It authorizes action to be taken under any of several circumstances. For example, section 8(e)'s effect prong is satisfied when:

> (i) such insured depository institution or business institution has suffered *or* probably will suffer financial loss or other damage;
>
> (ii) the interests of the depository institution's depositors have been *or* could be prejudiced; *or*
>
> (iii) such party has received financial gain *or* other benefit by reason of such violation, practice or breach . . . .

12 U.S.C. § 1818(e)(1)(B) (emphasis added). Plainly, there is substantial evidence that Proffitt "violated [the] law" when he breached his fiduciary duty by failing to disclose a conflict of interest to a Bank customer, 12 U.S.C. § 1818(e)(1)(A); that his breach of fiduciary duty caused the Bank to suffer "financial loss," *id.* § 1818(e)(1)(B); and that his breach of fiduciary duty at least "involve[d] personal dishonesty." *Id.* § 1818(e)(1)(C). Proffitt's challenge does not extend to the

FDIC's findings that the misconduct and culpability prongs were satisfied by Proffitt's 1990 conduct. *See* Petitioner's Br. 30. Proffitt argues instead that the effect prong was also satisfied in 1990, thus barring the FDIC's 1996 action, because the FDIC plainly could have determined in 1990 that the Bank "will probably suffer financial loss" because of Proffitt's actions. The FDIC responds that the effect prong did not begin section 8(e)'s accrual until the Tennessee Supreme Court rendered its final judgment in the Bolings' lawsuit in 1994. The question, then, is when was the effect prong met.[7]

Last year in *Pharaon*, we interpreted section 8(e)(1)'s effect prong. There the defendant argued that section 8(e)(1)(B) required the Federal Reserve Board (FRB) to demonstrate the exact amount of harm in order to satisfy the effect prong. The court rejected that interpretation because "[t]he plain language of the statute provides otherwise." *Id.* at 157. "Section 1818(e)(1)(B) allows the FRB to impose an order of prohibition not only if the insured institution 'suffered . . . financial loss or other damage' . . . but also if the institution 'will probably suffer financial loss or other damage.'" *Id.* Under *Pharaon*, then, the effect prong can be met by either potential or actual "financial loss or other damage." *See also Brickner v. FDIC*, 747 F.2d 1198, 1202–03 (8th Cir. 1984) (Section 1818(e)(1)'s use of " 'willful disregard' and 'continuing disregard' present two distinct, alternative standards for removal. The use of the disjunctive 'or' between the words 'willful' and 'continuing' in the statute reveals a clear intent to make either one an offense.").

Moreover, if we applied one statute of limitations to all of the alternative circumstances included in section 8(e)(1)(B), we would render the "has suffered" language superfluous. Whenever an institution "has

---

7. Because a section 8(e) proceeding can be initiated by more than one agency, namely, the FDIC, the OCC, the Federal Reserve Board and the Office of Thrift Supervision, *see Wachtel v. OTS*, 982 F.2d 581, 585 (D.C.Cir.1993), we do not extend *Chevron* deference to its interpretation of the statute. *See Bowen*, 476 U.S. at 643 n. 30, 106 S.Ct. 2101.

suffered" financial loss, an action based on the "will probably suffer" language would have been available before the financial loss in fact occurred. If the statute of limitations began running as to *all* effects as soon as the first effect occurred, the "will probably suffer" violation would always trigger the statute's accrual. Separate accrual for each alternative effect gives meaning to all of the statutory language. *See Connecticut Dep't of Income Maintenance v. Heckler*, 471 U.S. 524, 530 n. 15, 105 S.Ct. 2210, 85 L.Ed.2d 577 (1985) ("It is a familiar principle of statutory construction that courts should give effect, if possible, to every word that Congress has used in a statute.").

■ Finally, Proffitt argues that because the FDIC *could* have brought a section 8(e) removal and prohibition action in 1990, it was *required to* do so under the statute. The statute, however, expressly authorizes the FDIC to take action "whenever" it determines that the statutory prongs are satisfied. Section 8(e)'s legislative history, spare as it is, supports an expansive view of the enforcement options available to the FDIC (and the other banking regulatory agencies). In 1966, when the Congress first gave banking regulators removal authority, it allowed them little latitude. *See* 112 Cong. Rec. 20,083 (1966) (quoting Report of Senate Committee on Banking and Currency); *Anonymous v. FDIC*, 619 F.Supp. 866, 871–72 (D.D.C. 1985) (summarizing section 8(e)'s legislative history). With the enactment of FIRREA, however, the Congress attempted to lift some of the restrictions it had originally imposed on banking regulators. Before FIRREA the banking regulatory agencies were required to demonstrate that the "bank has suffered or will probably suffer substantial financial loss or other damage or that the interests of its depositors could be seriously prejudiced." 12 U.S.C. § 1818(e) (1988). In FIRREA, the Congress changed the language to "such [bank] has suffered or will probably suffer financial loss or other damage; [or] the interests of the [bank's] depositors have been or could be prejudiced." 12 U.S.C.

§ 1818(e)(1)(B)(i), (ii). The Committee Report explained the legislative purpose in making the change: "[A]n agency [could] proceed with [a] removal or prohibition action where warranted, without having to quantify losses to the institution or the degree of prejudice to depositors...." H.R. Rep. 101–54, at 392, *reprinted in* 1989 U.S.C.C.A.N. 188. The change was intended to:

> allow an agency to proceed with such an enforcement action whenever the institution has suffered any financial loss and has been harmed. The higher threshold found in current law has resulted in the FDIC losing cases at an early stage because the losses were not high enough ... or because the FDIC could not quantify the losses.... The regulators must be given the opportunity to proceed before losses become even greater.

*Id.* The Conference Report iterated that the banking regulatory agencies should be able to take action "when an institution has been harmed or the interests of depositors have been prejudiced without requiring the agencies to quantify the harm or prejudice." H.R.Rep. No. 101–222, at 439 (1989), *reprinted in* 1989 U.S.C.C.A.N. 478. The legislative history also notes that FIRREA was enacted in part to "expand, enhance, and clarify enforcement powers of the financial institution regulatory agencies." H.R.Rep. No. 101–54, at 311, *reprinted in* 1989 U.S.C.C.A.N. 107. If the FDIC were limited to acting within five years of determining that the Bank "will probably suffer financial loss," its burden would have been greater (establishing probability) than if it is also authorized to wait until the Bank "has suffered financial loss" (establishing actuality). To require the FDIC to speculate whether the Bank "will probably suffer" harm or forfeit the removal action altogether would impose upon the FDIC the kind of quantification that the Congress sought to eliminate with FIRREA. While the FDIC might well have brought an action earlier under the "will probably suffer" language, its failure to do so does not render untimely, and

therefore, unauthorized, its action based on the later occurring effect. Because the FDIC took action within five years of when the Bank in fact "suffered" financial loss in 1994, its section 8(e) action against Proffitt is not barred by section 2462's five-year statute of limitations.[8]

### C. Due Process

■ Finally, Proffitt argues that the FDIC violated his right to due process because it evaluated neither his current competence nor whether he presented a current risk of harm. But Proffitt also concedes that his due process claim fails if we conclude that the removal and prohibition action imposes a penalty. *See* Petitioner's Br. 35–36; Reply Br. 8. Because we have so concluded, Proffitt's due process argument fails.

For the foregoing reasons, we conclude that the FDIC's removal and prohibition action was properly taken and, accordingly, Proffitt's petition for review is

*Denied.*

SILBERMAN, Circuit Judge, dissenting:

I agree with the majority's conclusion that *Johnson v. SEC,* 87 F.3d 484 (D.C.Cir.1996), controls this case, and requires us to apply section 2462's five-year limitations period to the FDIC's removal action against Proffitt. While the FDIC makes a strong argument for the contrary result based on historical evidence that state courts declined to apply general statutes of limitations to disbarment proceedings, we considered and rejected this argument in *Johnson* and are in my view bound

by that determination. *See id.* at 488 n. 6. However, I do not agree with my colleagues' determination that section 8(e) allows the FDIC to bring an enforcement action against Proffitt seven years after his misconduct. The majority correctly recognizes that we may not defer to the FDIC's interpretation of section 8(e) because it is a statute administered by more than one agency, but proceeds to afford the FDIC an even greater deference by giving the agency, as a practical matter, the power to determine when the statute of limitations will be triggered.

Relying on a construction of section 8(e) that permits banking regulatory agencies to bring a removal action either at the point that it might be thought that a bank would probably suffer a financial loss or at some later time that an actual financial loss can demonstrated (given the vagaries of litigation and other imponderables it could be decades after the act), the majority concludes that it is within a regulatory agency's discretion as to which eventuality begins the running of the statute. In other words, the majority reads the statute as creating at least two separate[1] causes of action and gives the regulatory agencies an option to choose to bring an action based on a probable financial loss or an actual financial loss. That is not all. Since the statute allows a removal action based on probable or actual *other* damage, which would certainly include reputational harm, the agency presumably could also wait until sufficient newspaper articles appeared (which incidentally embarrassed the regulatory agency) and then determine that actual reputational harm to the depository

---

8. Although the FDIC does not make the argument, it is not limited to taking action based on the institution's "financial loss"—the statute also includes "other damage." 12 U.S.C. § 1818(e)(1)(B)(i).

1. I say "at least" because the majority observes that "[t]he same misconduct can produce different effects at different times, resulting in separate section 8(e) claims and separate accruals." Maj. Op. at 863. That proposition treats Proffitt's misconduct as something resembling a "continuing viola-

tion" like a conspiracy or kidnapping, with the statute of limitations period starting anew at each moment that a different "effect" of the increasingly historical misconduct appears. This is not only a peculiar way of understanding a violation that arose out of a discrete series of misdeeds by a banker, it is one that has been discouraged by the Supreme Court. *See Toussie v. United States,* 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970) (a statutory prohibition should rarely be construed as a continuing violation for statute of limitations purposes).

institution had occurred. Add to this the majority's rather improbable reliance on section 8(e)'s language authorizing an agency to bring a removal action "whenever" it determines that the statute's requirements are met, Maj. Op. at 863–64—which I take it means that the statute of limitations is triggered not by objective facts but by a subjective determination of the agency as prosecutor—and one arrives at the inevitable and astounding conclusion that, on the majority's view, the statute of limitations for an section 8(e) removal action begins to run when the agency *decides* it should begin to run (making it a *non-statute* statute reminiscent of the once infamous non-bank bank, *cf. Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 363, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986)). With all due respect to my colleagues this interpretation simply will not do.

It seems to me that it is the "three prong" characterization of the elements of a removal cause of action which leads my colleagues astray. Section 8(e) actually contemplates only one act on the part of the wrongdoer, the misconduct which amounts to a violation of a banking law or regulation. *See* 12 U.S.C. § 1818(e)(1)(A). To be sure, that act must also have certain characteristics. Section 8(e)(1)(C) requires that this act involve personal dishonesty on the part of the target; innocent mistakes are not grounds for removal. And the requirement of section 8(e)(1)(B) must be satisfied, which means that some consequences must flow from the act. But it does not follow that the so-called "culpability" and "effect" prongs constitute separate temporal events, as the majority concludes. I think it makes far more sense to think of them as *characteristics* of a banker's misconduct, which must be present at the time of the wrongful act. (Indeed, it seems that the "culpability prong" could *only* be established by reference to the time of a wrongdoer's misconduct.) Just as a new cause of action would not spring up if evidence of dishonesty—meeting sec-

tion 8(e)(1)(C)'s requirement—appeared ten years after a banker's misconduct, a new and distinct FDIC removal action should not arise at every point that evidence of new consequences flowing from that misconduct is uncovered. *Cf. 3M Co. v. Browner*, 17 F.3d 1453, 1460–63 (D.C.Cir.1994) (rejecting the application of the "discovery rule" in the context of an agency enforcement proceeding).

My colleagues believe that such a reading "render[s] the 'has suffered' language [in 1818(e)(1)(B) ] superfluous." Maj. Op. at 863. But this is plainly mistaken. Actual damage to an institution may or may not be immediately apparent at the time of the wrongful act; thus the FDIC is also permitted to bring an action where an institution "will *probably* suffer financial loss or other damage" or the depositors "*could* be prejudiced" from a banker's misconduct. 12 U.S.C. § 1818(e)(1)(B) (emphasis added). The majority is right when it notes that section 8(e)'s language gives enforcement agencies a great deal of discretion; the obvious purpose of the statute is to allow the regulatory agencies potentially to prosecute a wide range of misconduct. Its threshold is so low that I cannot imagine any violation of law, involving personal dishonesty on the part of a bank officer, that would not qualify.[2] However, this discretion is relevant to the range of actions that may be prosecuted, not to the time at which an agency may bring an enforcement action. To the contrary, the early running of the statute of limitations seems to me the inevitable price of section 8(e)'s low threshold; the agencies have to take the "bitter with the sweet."

As we have recently noted in the very context of an administrative enforcement proceeding, the statute of limitations begins to run when the factual and legal prerequisites for an enforcement action are in place. *See 3M*, 17 F.3d at 1460. There is no serious question that these prerequisites were in place at the time of Proffitt's misconduct in 1990; the FDIC's

---

**2.** Unless, perhaps, the act fortuitously led to a bank profit.

objection that my reading of the statute would force it to bring actions too early is ridiculous, given the minimal hurdle set by the "other damage" language in section 8(e)(1)(B). Nor was there any practical excuse for the FDIC's behavior in this case. If the FDIC were sincere in claiming that it delayed its action out of concerns of fairness given the pending litigation in the Tennessee courts, it could have sought an agreement with Proffitt tolling the running of the statute of limitations.

Indeed, the facts presented here aptly demonstrate the costs of not enforcing statutes of limitations vigorously. The pressure on courts not to do so is obvious, as it can permit a wrongdoer to escape his or her just desserts. But ignoring the limitations on an agency's action creates an undesirable incentive for government prosecutors to sit on their hands until some event—typically publicity—induces action.