# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 8, 2025

Lyle W. Cayce
Clerk

No. 23-60617

_____

Saul Ortega, *Former Chief Financial Officer, Director, President, Chief Executive Officer, and Chairman of the Board*; David Rogers, Jr., Former Chairman of the Board,

*Petitioners*,

*versus*

Office of the Comptroller of the Currency,

*Respondent*.

_____

Petition for Review from an Order of the
Department of Treasury (Except IRS)
Agency No. AA-EC-2017-44
Agency No. AA-EC-2017-45

_____

Before Wiener, Douglas, and Ramirez, *Circuit Judges*.
Jacques L. Wiener, Jr., *Circuit Judge*:

Petitioners-Appellants are former officers and directors of First National Bank (the Bank), based in Edinburg, Texas. Following the financial crisis of 2008, the Bank experienced significant hardships, and petitioners helped craft several strategies to comply with regulators and to stave off collapse. The efforts failed and the Bank went under in 2013. In 2017, the Office of the Comptroller of the Currency (OCC) brought an enforcement action

against petitioners, alleging that they (1) engaged in unsafe and unsound banking practices, (2) breached their fiduciary duties, and (3) filed materially inaccurate reports. While the matter was pending before an Administrative Law Judge (ALJ), the Supreme Court decided *Lucia v. SEC*, so the OCC reassigned the matter to a new ALJ. The new ALJ reviewed and ratified the rulings that had occurred previously, then conducted her own proceedings and issued a recommendation to the Comptroller. The Comptroller adopted in part and rejected in part the ALJ's recommendation. The final orders prohibited both petitioners from working in the industry and assessed civil penalties. Petitioners appealed to this court for review of the final agency decision. For the reasons that follow, we DENY their petition for review.

## I. Background

We begin with the facts of the case, including a description of the various banking strategies that petitioners employed that were the subjects of the OCC's enforcement action. We then turn to the agency proceeding itself.

### A. Facts

Saul Ortega and David Rogers, Jr. (collectively, petitioners) are former directors and officers of First National Bank, a community bank based in Edinburg, Texas. Rogers was chairman of the Bank's board of directors from 1981 to 2011. Ortega was the Chief Financial Officer from 1994 until he replaced Rogers as chairman in 2011. Ortega served as chairman until the Bank failed in 2013. The Bank was a wholly-owned subsidiary of First National Bank Group, Inc. (the "Holding Company") and both Ortega and Rogers served as officers and directors of the Holding Company between 2008 and 2011. During that time, both of them also served as voting members on the Bank's Loan and Discount Committee (L&D Committee), which met weekly and was responsible for approving loans exceeding $1 million.

No. 23-60617

As a result of the 2008 financial crisis, the Bank incurred a loss of $174 million on its investments in the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac). Consequently, in early 2009, the OCC[1] began "institut[ing] measures requiring that the Bank . . . achieve and maintain higher capital levels and minimum capital ratios and improve accounting for nonaccrual loans." Despite cash infusions, challenges persisted, leading the OCC to issue a consent order in early 2011, again requiring that the Bank correct its unsafe and unsound practices. In June 2011, Ortega assumed the role of chairman, and—while the OCC observed some positive changes—its 2012 Report of Examination concluded that those efforts were ineffective and that "the Bank's capital position [was] 'critically deficient.'" By June 2013, the Bank was "critically undercapitalized," and the OCC closed the Bank in September 2013.

Petitioners' misconduct occurred in connection with their efforts to raise capital in response to the losses stemming from the financial crisis. There were three strategies or practices on which the OCC based liability: (1) the Capital Raise Strategy; (2) the Other Real Estate Owned (OREO) portfolio Strategy; and (3) the Bank's nonaccrual loan accounting practices.[2]

*1. The Capital Raise Strategy*

The Holding Company injected $24 million of capital into the Bank in the immediate aftermath of the 2008 crisis, and Rogers and other managers

---

[1] The OCC is the "appropriate Federal banking agency" authorized to bring the enforcement action at issue here. 12 U.S.C. § 1813(q).

[2] The Notice of Charges included a fourth count relating to loans the Bank issued to Rogers's son (David Rogers III) and entities he owned, but the Comptroller dismissed that charge for failure to prove all the elements. That dismissal is not on appeal, so we need not discuss it.

committed to raising another $35 million. In February of 2009, the OCC formally imposed various capital and risk ratio requirements on the Bank but, to satisfy those requirements, the Bank needed to raise an additional $50 to $75 million. The OCC emphasized that any capital plan the Bank submitted must be "based on realistic assumptions [and be] likely to succeed in restoring the Bank's capital," and that it must "not increase the risk to the Bank."

In February 2009, the Bank submitted its capital plan, signed by Ortega, representing that it would raise funds by selling Holding Company common stock, and that "'any portion' of the proceeds from this offering that were 'injected into the Bank would count as Tier 1 capital.'" However, the Bank did *not* disclose that it would be financing loans to purchasers of common stock.

On April 14, 2009, "eleven days after the meeting with OCC officials," the Holding Company issued a private placement memo concerning its offering of common stock in which it stated that a portion of the proceeds would be used to support the Bank's capital efforts. That same day, the Bank's L&D Committee approved a $500,000 unsecured loan to Kenneth Everhard, a friend of Rogers. The L&D Committee meeting minutes reflected that the Everhard loan proceeds were "to be used as a revolving line of credit for working capital," but two weeks later, Everhard purchased $500,025 in Holding Company common stock.[3]

---

[3] The Everhard loan exemplifies the Capital Raise Strategy. The Bank would extend loans the proceeds from which were then used to purchase Holding Company common stock, after which the Holding Company would "downstream" the Bank-financed stock purchases back into the Bank as purportedly raised capital. The ALJ described that strategy as "someone transferring a twenty dollar bill from their left pocket to the kitchen table to their right pocket and then claiming to be twenty dollars richer when they then switch the bill again to the pocket from which it started." The record reflects that both Rogers and Ortega were aware that those loans were issued for that purpose and that they "solicited investments from family and friends as well as Bank officers, directors, and lower-level

No. 23-60617

Throughout that time, the Bank was communicating with the OCC about its ability to meet its capital ratio requirements. Although the Bank reported various numbers in connection with the stock offering, it never disclosed that the Bank itself was lending the money for those purchases, even though the Bank represented to the OCC that, based on those purchases, it would "achieve the required Tier 1 capital ratio" by the deadline. Throughout 2009, the Bank and the OCC continued to be in frequent communication about the Bank's capital raising efforts, but the Bank never disclosed that it was funding those stock purchases.

Enforcement counsel's expert identified sixty-three such loans that occurred between April 2009 and May 2011, and the Comptroller accepted the ALJ's finding "that somewhere between $3 million and $17.3 million in proceeds from Holding Company stock purchases financed by" this strategy were reinjected into the Bank as "putative capital." But, as one expert testified, "[f]or regulatory purposes, a bank can't create its own capital on its own by creating a loan and extending that money. You know, you're essentially making money out of thin air by orchestrating a scheme like this. So it's not permissible to treat it as regulatory capital."[4]

---

employees." These are some examples of the Capital Raise Strategy in action between April and May of 2009:

- Margarett Scott: April 28, the Bank loaned her $75,000 and on April 29, she purchased $75,000 in Holding Company stock

- Curtis Brockman: May 4, the Bank loaned him $112,500 and on May 8, he purchased $112,500 in Holding Company stock

- Blanca Gonzalez: May 8, the Bank loaned her $250,000 and on May 11, she purchased $250,050 in Holding Company stock

[4] The OCC identified several suspicious characteristics of these Capital Raise loans: (1) most were unsecured; (2) most were offered at a below-market interest rate of 4.25 percent; (3) some provided for interest-only payments followed by a balloon payment at maturity; and (4) for some of the borrowers, these *unsecured* loans were offered at better

Ultimately, the Bank recorded significant losses on those loans. For example, the OCC found that, on June 12, 2013, "the Bank recorded combined losses of $347,240.63 on Capital Raise Loans that it had made to Ms. Gonzalez and Jose Rodriguez," loans which corresponded to 2009 Holding Company stock purchase. It also found that, at the Bank's failing in September 2013—"numerous other Capital Raise Loans had not been paid off." When the Federal Deposit Insurance Corporation (FDIC) stepped in as receiver for the Bank, it "suffered $3,808,058.28 in losses when certain outstanding Capital Raise Loans were charged off" as part of recovery maximization efforts.

### 2. The OREO Strategy

Petitioners were also found to have engaged in misconduct in their strategy to reduce the Bank's OREO portfolio. That portfolio included real estate assets owned by the Bank. Such assets are not typically income-performing; maintenance and other costs associated with such assets can strain financial resources.

In 2008, the Bank's OREO portfolio began to grow significantly, and both the OCC and the Bank recognized the urgency of reducing the portfolio's size. The Bank's strategy was to aggressively sell off those properties at their appraised value rather than at a reduced value, and to do so on lenient terms. The OCC had expressed initial approval of that strategy because, by selling those properties to individuals with "the ability to manage the project or repay the debt," the Bank would reduce the risk associated with its

---

terms than other Bank-issued *secured* loans to the *same* borrowers, indicating that the "ability to repay was not a primary consideration." Had the OCC been aware that the Bank was financing those purchases, it "would have informed the Bank that 'the capital raised through loans from the bank would not qualify as Tier 1 capital and would not meet the requirements.'"

portfolio. But, by 2011, the OCC "observed a worrying pattern" in the OREO Strategy: the Bank was making loans to borrowers so that the borrowers could purchase the properties, but those borrowers had little ability to repay the loans. Consequently, "many OREO properties were returning to the Bank's portfolio after they had been sold." In some ways, that circle resembled the Capital Raise Strategy.[5]

The Bank realized tremendous losses as a result of the OREO Strategy. Between September 2012 and March 2013, it lost approximately $7.3 million on six OREO loans. After the Bank failed, the FDIC, in its receiver capacity, suffered $96.55 million in losses related to the OREO Strategy. The OCC recognized that there were some credible reasons the Bank pursued that strategy, like the "good faith belief that the properties were worth more in the long run than the 'speculators' and 'scavengers' of the time were willing to pay."

The accounting-related misconduct in the OREO Strategy resulted from petitioners' failure to use a present-value calculation for the OREO losses. Several times between 2009 and 2011, the OCC instructed the Bank to measure losses on its below-market interest rate OREO loans by using present-value cash flow analyses. But when the Bank complied in 2011, it reported "only a $4.8 million discount of its $309 million OREO portfolio," which caused the Bank to overstate its assets by at least $9.5 million from that point forward. Such reporting is not in line with GAAP.

---

[5] Some concerning features of the OREO loans the OCC identified were: (1) little or no down payment; (2) liberal terms; (3) below-market interest rates; and (4) the individual borrowers did not demonstrate repayment ability. Some borrowers were "newly-formed entities with no financial history" to review. In the hearing, petitioners admitted that loans which are 100% financed "should be graded substandard and that it would be unsafe or unsound to approve [such] a loan." Those features went against the Bank's own policies.

*3. Nonaccrual Loan Accounting Practices*

Usually, a bank collecting on a loan will record interest payments as income, even if it is yet to be collected. When a bank doubts the ability of a borrower to repay a loan, it usually places the loan in nonaccrual status, meaning interest does not accrue.[6] Various OCC policies require specific documentation and analysis supporting repayment ability when a bank uses the cash-basis method on nonaccrual loans.

Here, the Bank's default setting in its accounting system was to use the cost-recovery method, but evidence showed that petitioners changed this default method to the cash-basis method. In January of 2009, the OCC and the Bank entered a Memorandum of Understanding (MOU) requiring that the Bank "immediately reverse or charge off all interest that has been accrued contrary to the requirements contained in the [Call Report Instructions] governing nonaccrual loans" and "develop and implement a written policy that shall provide for auditing accrued interest on loans." But the policy that the Bank created was deemed insufficient because it did not comply with "the standard articulated by" the OCC.

In 2011 and 2012 consent orders between the OCC and Bank, the MOU requirements were reiterated, but the Bank's management did not change course. Twice more in 2012, the Bank's chief audit officer specifically raised the issue to Ortega and others, but still there was no change of course. By 2013, the OCC calculated overstated capital and earnings for 2011, 2012,

---

[6] There are two methods to account for nonaccrual loans. The cost-recovery method is the "general rule" when collection is uncertain. Under this method, any payments received go toward the principal and the bank does not recognize interest. Alternatively, the cash-basis method allows banks to continue separating payments between principal and interest, recording any interest as income.

and 2013's first quarter to be $1.4 million, $9.8 million, and $3.6 million, respectively.

## B. The Enforcement Action

On September 25, 2017, the OCC issued its Notice of Charges, beginning the enforcement action. It asserted that petitioners engaged in unsafe or unsound banking practices, breached their fiduciary duties, and filed materially inaccurate information. Pursuant to 28 U.S.C. § 2462, the OCC had "five years from the date when the claim first accrued" to bring its enforcement action. Accordingly, any claim that first accrued prior to September 25, 2012, could not be pursued in this proceeding, but claims first accruing after September 25, 2012, could be.

ALJ Jennifer Whang oversaw the matter after some internal reassignment.[7] ALJ Whang reviewed all of the prior ALJs' prehearing actions and orders and ratified them. After additional prehearing motion practice, ALJ Whang conducted a twelve-day hearing, entertained post-hearing briefing, then issued her recommended decision. Relevant to this appeal, the Comptroller adopted almost all of ALJ Whang's recommended decision. She had found that the OCC's enforcement counsel failed to meet its burden to ban petitioners from working in the industry as a result of the Capital Raise Strategy, but the Comptroller determined otherwise and imposed the ban. The final decision ordered prohibitions relating to the Capital Raise Strategy against both petitioners and imposed civil penalties of $250,000 against both petitioners in connection with the lending- and accounting-related misconduct. Petitioners appealed.

---

[7] This matter was first assigned to ALJ Christopher McNeil, but the OCC reassigned the pending Ortega matter to ALJ Miserendino. ALJ Miserendino retired shortly thereafter, and the matter was then reassigned to ALJ Jennifer Whang.

No. 23-60617

## II. Jurisdiction & Standard of Review

We have jurisdiction pursuant to 12 U.S.C. § 1818(h)(2) because this is an appeal from a final agency order. Constitutional issues are reviewed *de novo. See Jarkesy v. SEC*, 34 F.4th 446, 451 (5th Cir. 2022), *aff'd*, 603 U.S. 109 (2024). Statutory interpretation is also reviewed *de novo* and such interpretation "begins and, if possible, ends with the language of the statute." *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

The Administrative Procedure Act (APA) establishes the scope of review of agency proceedings. 5 U.S.C. § 706. This court may set aside an agency action if it is arbitrary, capricious, or otherwise not in accordance with law, § 706(2)(A), contrary to the Constitution, § 706(2)(B), or unsupported by substantial evidence, § 706(2)(E). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 215 (5th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## III. Analysis

Petitioners raise six issues on appeal: (1) whether the enforcement action violated the Seventh Amendment; (2) whether ALJ Whang's appointment was valid; (3) whether the statute of limitations barred the OCC's enforcement action; (4) whether evidentiary issues at trial were appropriate; (5) whether the Comptroller's prohibition order was supported by substantial evidence; and (6) whether there should be a stricter evidentiary standard for prohibition orders. We address each in that order.

No. 23-60617

## A. Seventh Amendment

Petitioners assert that the enforcement proceeding violated their right to a jury trial. They rely on *SEC v. Jarkesy* and submit that the civil penalty is the "type of claim that *Jarkesy* squarely holds is entitled to a jury."

The Seventh Amendment inquiry is twofold: (1) whether the action implicates the Seventh Amendment (examining the cause of action and, more importantly, the remedy sought); and, if so, (2) whether the public rights exception applies. *SEC v. Jarkesy*, 603 U.S. 109, 120–21 (2024). The OCC's and petitioners' contentions surround whether this case falls within the public rights doctrine. We therefore focus our analysis there.

The public rights doctrine is an "area of frequently arcane distinctions and confusing precedents." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 583 (1985) (citation modified). But even in "matters that arguably fall within the scope of the public rights doctrine, the presumption is in favor of Article III courts." *Jarkesy*, 603 U.S. at 132 (citation modified). Accordingly, this narrow exception has been applied in a handful of areas where such matters "historically could have been determined exclusively by [the executive and legislative] branches" without Article III involvement. *Stern v. Marshall*, 564 U.S. 462, 485 (2011) (citation modified). Some examples are revenue collection,[8] immigration,[9] foreign commerce,[10] and the administration of public lands.[11] *See Jarkesy*, 603 U.S. at 128–31 (collecting cases).

---

[8] *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272 (1855).

[9] *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320 (1909).

[10] *Ex parte Bakelite Corp.*, 279 U.S. 438 (1929).

[11] *Crowell v. Benson*, 285 U.S. 22 (1932).

11

No. 23-60617

First, the OCC urges us to rely on *Akin v. Office of Thrift Supervision*, 950 F.2d 1180 (5th Cir. 1992), to hold that § 1818 proceedings adjudicate public rights. But that was not the primary issue in that case, and although *Akin* is still good law in this circuit, we do not find it on all fours with the instant case.[12] We therefore do not rely on it to reach our holding.

Petitioners urge us to apply *Jarkesy*, but *Jarkesy* is distinguishable in important ways. In *Jarkesy*, the Supreme Court looked at several statutes governing the SEC's enforcement proceedings (not § 1818) to determine whether an SEC antifraud enforcement action seeking civil penalties required a jury trial. *See* 603 U.S. at 115–16. The Court held that "*Granfinanciera* effectively decide[d] [the] case" because the substance of the claims in both cases involved private rights: In *Granfinanciera, S.A. v. Nordberg*, the

_____

[12] *Akin* was an appeal from a final order issued under § 1818—the petitioner argued that the order exceeded the Office of Thrift Supervision's (OTS) authority under the statute and also that he was denied a jury trial in the agency proceeding. *Id.* at 1182. We stated that the petitioner's jury trial claim "must fail" because "[w]here there is a proper administrative forum for adjudicating public rights, there is no right to a jury trial."[12] *Id.* at 1186 (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42, 54–55 (1989)). However, we were not expressly considering the public rights question in *Akin* because that case involved a cease-and-desist proceeding seeking a disgorgement remedy—a quintessential remedy in equity, as opposed to a remedy at law. *See id.* (noting that the petitioner's characterization of his claim as one at law "was rejected . . . and may not serve as the basis for a jury trial demand here").

We view this sentence about public rights as a general statement of law and not binding on us in the instant matter. We do, however, acknowledge that other circuits have relied on *Akin* to hold that § 1818 administrative enforcement actions fall within the public rights exception. *E.g.*, *Simpson v. Off. of Thrift Supervision*, 29 F.3d 1418, 1423 (9th Cir. 1994) (observing that "the Fifth and Eleventh Circuits have found that the right to a jury trial in an OTS proceeding is not violated because the OTS's action is an enforcement of public rights"); *Cavallari v. Off. of Comptroller of Currency*, 57 F.3d 137, 145 (2d Cir. 1995) (holding that "no jury trial was required" under § 1818 because "[t]he OCC charges clearly implicate public rights, as distinct from any legal claims against Cavallari that the FDIC as . . . receiver might bring").

claim was a fraudulent conveyance action outside of a bankruptcy proceeding, and in *Jarkesy*, the claim was for securities fraud. *Granfinanciera*, 492 U.S. at 36; *Jarkesy*, 603 U.S. at 134. The *Jarkesy* Court held that those claims were essentially akin to "common law fraud" claims, importing "common law soil" with them, so they implicated the Seventh Amendment. *Id.* at 134–35. And because those claims involved private rights, the public rights exception did not apply. *Id.* at 135, 137.

In its reasoning, the Court emphasized several points that distinguish *Jarkesy* and its statutory context from petitioners' instant case and § 1818. The Court frequently mentioned that, in 2010, the Dodd-Frank Act expanded the SEC's ability to seek civil penalties in-house, whereas, before 2010, the SEC was required to file suit in federal court to seek penalties. *E.g.*, *id.* at 118 ("In other words, the SEC may now seek civil penalties in federal court, or it may impose them through its own in-house proceedings."); *id.* at 119 ("Relying on the new authority conferred by the Dodd-Frank Act, the SEC opted to adjudicate the matter itself rather than in federal court."); *id.* at 140 ("By contrast, law courts have dealt with fraud actions since before the founding, and Congress had authorized the SEC to bring such actions in Article III courts and still authorizes the SEC to do so today."). The Court reasoned that this history supported the conclusion that these claims were not "novel" because common law fraud claims had a long history of adjudication in Article III courts. *Id.* at 140 (noting that courts clearly do not "lack the capacity needed to adjudicate such actions").

But § 1818 has never authorized the OCC or other banking regulators to choose their forum when seeking civil penalties in enforcement actions. *See id.* In fact, § 1818 enumerates specific circumstances in which federal district courts have jurisdiction over agency-related actions, and enforcement actions are decisively not among them. *See* 12 U.S.C. § 1818(h)(1) (providing that "[a]ny hearing provided for in this section . . . shall be conducted in

accordance with the provisions of chapter 5 of title 5," not in federal district court); *see also Bank of La. v. FDIC*, 919 F.3d 916, 924 (5th Cir. 2019) (listing the various provisions in § 1818 that authorize district court jurisdiction). The SEC's new ability to seek civil penalties in-house as well as in federal court is distinctly different from the OCC's history of exclusively in-house proceedings.

The *Jarkesy* Court also held that the SEC's securities fraud enforcement action was not within the "distinctive areas involving governmental prerogatives" in which courts have found public rights, instead characterizing it as "regulat[ing] transactions between private individuals interacting in a pre-existing market." 603 U.S. at 120, 135. In the instant case, however, the enforcement action fits more squarely within the public-rights doctrine. The OCC's enforcement action was not meant to regulate private transactions like the fraud Jarkesy committed on certain accredited investors. Rather, it was meant to vindicate safety to the banking ecosystem at large, and here, the soundness of First National Bank following the financial crisis.[13] The purposes of the OCC's enforcement actions, and the statutory scheme in general, are to regulate federally insured and nationally chartered banks, to ensure proper stewardship of public funds in the federal deposit insurance program, and to safeguard the value of the national currency. These prerogatives have been, historically and exclusively, the domain of the non-Article III branches.

---

[13] We can see a non-frivolous argument that the lending-related misconduct was like a "private transaction" between the Bank and each borrower, and that petitioners' accounting-related efforts to conceal the true nature of these circular transactions resembles fraud, closing the gap a little between the facts at bar and the facts in *Jarkesy*. But, as we will explain shortly, the history of the industry's creation and regulation brings banking enforcement into the public rights realm.

No. 23-60617

A review of the statutory and legislative history of the major banking regulatory laws supports this conclusion. A core feature of early American intellectual debate was whether the new nation should establish a national bank. *See* Jerry W. Markham, *Banking Regulation: Its History and Future*, 4 N.C. BANKING INST. 221, 223–24 (2000). When Alexander Hamilton served as the first Secretary of the Treasury, he oversaw the creation of the Bank of the United States, but it was controversial from the start and Congress did not reauthorize it when its charter expired in 1811.[14] *See id.*; Andrew T. Hill, *The First Bank of the United States*, Federal Reserve History, https://www.federalreservehistory.org/essays/first-bank-of-the-us (Dec. 4, 2015); Federal Reserve Bank of New York, *The Founding of the Fed*, https://www.newyorkfed.org/aboutthefed/history_article.html (last visited May 9, 2025).

State-chartered banks were prominent at that time, however, and, between 1782 and 1837, "over 700 banks sprang up in the United States." Markham, *supra* at 224 (citing J. Van Fenstermaker, *The Development of American Commercial Banking: 1782-1837* 4-5 (1965)). During the Civil War, President Lincoln faced difficulties funding the war effort, given the decentralized nature of banking in the early republic. William J. Kambas, *The Development of the U.S. Banking System: From Colonial Convenience to National Necessity*, 28 RUTGERS L. REC. 4 (2004). The only banks that existed by the mid-1800s were state-chartered banks, and notes issued by the U.S. Treasury were quickly losing value. *See* Markham, *supra*, at 227–28.

---

[14] *See* Act of Feb. 25, 1791, ch. 10, 1 Stat. 191 (1791) (creating First National Bank); Act of Apr. 10, 1816, ch. 44, 14 Stat. 266 (1816) (creating the Second National Bank). The Second National Bank's charter was also allowed to expire after its twenty-year term had run. *See* Federal Reserve Bank of New York, *The Founding of the Fed*, https://www.newyorkfed.org/aboutthefed/history_article.html (last visited May 9, 2025).

No. 23-60617

The National Currency Act of 1863 and its replacement, the National Bank Act of 1864 (NBA), were passed as the solution to the severe financial challenges straining the Union. *See* National Currency Act, ch. 58, § 1, 12 Stat. 665, 665–66 (1863); National Bank Act, ch. 106, § 1, 13 Stat. 99, 99–100 (1864). In that early legislation, Congress authorized federally chartered banks in order to establish a national uniform currency and support a bond market. 13 Stat. at 99–100. The NBA also established various requirements for national banks, such as required capital and debt limits. *See* 13 Stat. at 108–09.

Those statutes, and many successors, were premised on Congress's authority to provide a national currency. *See* 12 Stat. at 665 ("An Act to provide a national Currency"); 13 Stat. at 99 ("An Act to provide a National Currency"); *see also Tiffany v. Nat'l Bank of Mo.*, 85 U.S. 409, 413 (1873) ("National banks have been National favorites. They were established for the purpose, in part, of providing a currency for the whole country, and in part to create a market for the loans of the General government."); 112 Cong. Rec. 24,983 (1966) (statement of Rep. Wright Patman, addressing the penalties created under 12 U.S.C. § 1818) ("However, we in Congress, in carrying out our mandate under *article I, section 8, clause 5*, of the Constitution to assure the public of a sound monetary system, must be constantly alert to possible weaknesses in our financial system." (emphasis added)).[15]

---

[15] Subsequent major banking legislation is no different. Congress passed the Federal Reserve Act of 1913 in response to the Panic of 1907 and to prevent future crises. Pub. L. No. 63-43, 38 Stat. 251 (1913). Its stated purpose was, *inter alia*, "to furnish an elastic currency" and it created the Federal Reserve System, which provided that bank-issued notes would be "obligations of the United States." *Id.* at 251, 265. At the time, lawmakers emphasized the public nature of national banks. *See, e.g.*, 51 Cong. Rec. 1156 (1913) (statement of Sen. Owen) ("It should always be kept in mind that it is not the welfare of the bank, nor the welfare of the depositor which is the main object to be attained, but it is in the prevention of panic, the protection of our commerce, the stability of business

No. 23-60617

In 1966, Congress amended its banking regulatory framework by, *inter alia*, adding § 1818(h)(1) to provide adjudicative enforcement hearings by the appropriate federal (executive branch) agency, consistent with the APA. Financial Institutions Supervisory Act of 1966, Pub. L. No. 89-695, § 202, 80 Stat. 1046, 1051. But civil penalties were not yet in the toolbox, and the only enforcement sticks that Congress gave the agencies were to issue cease-and-desist orders or terminate insurance coverage of bank deposits. *See id.* (adding (h)(2) cease and desist remedy). In the Financial Institutions Regulatory and Interest Rate Control Act of 1978, Congress allowed for civil monetary penalties, but that remedy was only available in the framework Congress created—agencies could not seek remedies in federal court. Pub. L. No. 95-630, § 107, 92 Stat. 3641, 3660–61 (1978). In 1989, Congress amended those statutes in the Financial Institutions Regulatory Reform and Enforcement Act (FIRREA) to add prohibition remedies and to provide for tiers of civil monetary penalties. Pub. L. No. 101-73, § 904, 103 Stat. 183, 457 (1989).

We emphasize that there were no federally chartered banks until Congress authorized them, nor were there regulatory causes of action against such banks in the 18th century such that the Seventh Amendment could

---

conditions, and the maintenance in active operations of the productive energies of the Nation, which is the question of vital importance."); *id.* at 1066 (statement of Sen. Borah) ("It will be observed that the Supreme Court places this [power to coin currency] among the great and sovereign powers of the Government, and seemingly a power which should be exercised, if exercised at all, for an entire people and not in a way to benefit a class or a particular business. It is a power which, if it exists at all, begets an obligation which is not only commanding but exclusive.").

In 1933, in response to bank failures during the Great Depression, Congress passed the Banking Act of 1933 (the Glass-Steagall Act), which created the FDIC. Pub. L. No. 73-66, § 12B, 48 Stat. 162, 168 (1933). Shortly thereafter, Congress required national banks to purchase insurance from the FDIC. *See* Banking Act of 1935, Pub. L. No. 74-305, § 101(e)(2), 49 Stat. 684, 687. Those laws further solidified the relationship between the federal government—specifically Congress—and national banks.

17

"preserve" such suits. And when Congress ultimately created this industry and its attendant safeguards, it assigned enforcement to the executive branch, with no involvement from Article III courts except those expressly permitted by the statute. *See Stern*, 564 U.S. at 485 (holding that public rights are those that "historically could have been determined exclusively by [the executive and legislative] branches" (citation modified)).

Compelling our holding, the Supreme Court has consistently affirmed this "unbroken historical pedigree." *See Jarkesy*, 603 U.S. at 153 (Gorsuch, J., concurring). Beginning with the early attempts to establish the Bank of the United States, the Supreme Court explained:

> The Bank is not considered as a private corporation, whose principal object is individual trade and individual profit; but as a public corporation, created for public and national purposes. . . . *It was not created for its own sake, or for private purposes.* It has never been supposed that Congress could create such a corporation. . . . It is not an instrument which the government found ready made, and has supposed to be adapted to its purposes; but *one which was created in the form in which it now appears, for national purposes only*.

*Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738, 860 (1824) (emphasis added).

After the passage of the early federal banking laws that allowed for national banks, the Supreme Court stated that "[n]ational banks have been National favorites. They were established for the purpose, in part, of providing a currency for the whole country, and in part to create a market for the loans of the General government," acknowledging the historical context from

which the National Currency Act and the NBA resulted.[16] *Tiffany*, 85 U.S. at 413.

Most directly on point, in 1903, the Supreme Court favorably discussed a Pennsylvania Supreme Court case that found the regulation of national banks and their employees to be squarely outside the common law. *Easton v. Iowa*, 188 U.S. 220, 232–33 (1903) (citing *Commonwealth ex rel. Torrey v. Ketner*, 92 Pa. 372 (Pa. 1880)). In *Ketner*, the commonwealth criminally prosecuted a bank cashier for embezzlement, but the Pennsylvania Supreme Court held that the offense "[wa]s not indictable either at common law or under the statutes of Pennsylvania." *Ketner*, 92 Pa. at 377. The Supreme Court quoted the following language from *Ketner* with approval:

> We are spared further comment upon these acts for the reason that they have *no application to national banks*. Neither of them refers to national banks in terms, and we must presume that when the legislature used the words "any bank" that it referred to banks created under and by virtue of the laws of Pennsylvania. *The national banks are the creatures of another sovereignty. They were created and are now regulated by the acts of Congress. When our acts of 1860 and 1861 were passed there were no national banks, nor even a law to authorize their creation. . . .* An Act of Assembly prescribing the manner in which the business of *all* banks shall be conducted, or limiting the number of the directors thereof, could not by implication be extended to national banks, for the reason that the affairs of *such banks are*

_____

[16] We could go on. For example, in 1896, the Court stated that "[n]ational banks are instrumentalities of the federal government, *created for a public purpose, and as such necessarily subject to the paramount authority of the United States*." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896) (emphasis added). And when asked whether "the lodgment of authority in the comptroller . . . is tantamount to vesting that officer with judicial power, in violation of the constitution," the Supreme Court answered in a resounding negative, commanding that "these contentions have been long since settled, and are not open to further discussion." *Bushnell v. Leland*, 164 U.S. 684, 685 (1897) (collecting sources).

*exclusively under the control of Congress*. Much less can we, by mere implication, extend penal statutes like those of 1861 and 1878 to such institutions. The offence for which the relator is held is *not indictable either at common law or under the statutes of Pennsylvania*. We therefore order him to be discharged.

*Easton*, 188 U.S. at 233 (quoting *Ketner*, 92 Pa. at 376–77). "Whatever their roots, traditionally recognized public rights have at least one feature in common: a serious and unbroken historical pedigree." *Jarkesy*, 603 U.S. at 153 (Gorsuch, J., concurring). We are left without doubt that we are dealing with such a serious and unbroken historical pedigree today.[17]

Petitioners nevertheless assert that portions of § 1818 were enacted to combat fraud and abuse, and that unsafe banking practice allegations ring in professional negligence. They point to a House Report, in connection with 1989 FIRREA amendments, that credits "misconduct, fraud, and abuse" as contributors to bank failures and the "tremendous backlog in pending criminal proceedings" as impetus for the enhanced enforcement penalties. To the extent that congressional motivation behind the 1989 FIRREA amendments

---

[17] Nevertheless, petitioners insist that at least one state court affirmed the right to a jury in what they characterize as an "analogous" case against bankers. Citing *Hun v. Cary*, they assert that unsafe and unsound banking practices resemble common law negligence. *See* 82 N.Y. 65 (N.Y. 1880). We disagree. *Hun* involved a state bank that predated most federal banking regulation. *See id.* at 74; Act of April 18, 1867, ch. 467, 1867 N.Y. Laws 1152 (incorporating Central Park Savings Bank). While *Hun* deals with a negligence action against a bank's trustees, it was brought by the bank's receiver. *Hun*, 82 N.Y. at 74–77. It was not an enforcement action targeting banking practices that jeopardize the national economy—it was an action by a principal against its agent. *Id.* at 79 ("The receiver in this case represents the bank, and may maintain any action the bank could have maintained. . . . It has never been doubted that a principal may sue his agent in an action at law for any damages caused by culpable *misfeasance* or *non-feasance* in the business of the agency."). This posture is not analogous to an enforcement action and *Hun* is not helpful here.

impacts our public rights analysis, it is more analogous to the motivations underpinning *Atlas Roofing*'s OSHA than *Jarkesy*'s antifraud provisions.

In *Atlas Roofing Co. v. Occupational Safety and Health Review Commission*, the Supreme Court addressed whether the Seventh Amendment applied to OSHA's regulatory framework that provides for civil monetary penalties. 430 U.S. 442, 444–45 (1977). Congress created that new statutory scheme because the existing methods for vindicating workplace injury suits—negligence and wrongful death suits in court—were inadequate. *Id.* ("Finding the existing state statutory remedies as well as state common-law actions for negligence and wrongful death to be inadequate to protect the employee population from death and injury due to unsafe working conditions, Congress enacted [OSHA]."). The Supreme Court held that enforcement actions under OSHA, seeking civil monetary penalties, were public rights and that Congress permissibly assigned their adjudication to the agency instead of Article III courts.[18] *Id.* at 449–50.

The FIRREA amendments are analogous to *Atlas Roofing*'s OSHA: Congress saw the inadequacy of court adjudication of a particular problem, created new remedies to target that particular problem, and assigned their adjudication to an administrative agency. *Compare Atlas Roofing*, 430 U.S. at 444–45, *with* H.R. Rep. 101-54(I), Title IX at 464–66, *and* Pub. L. No. 101-73, 103 Stat. 183, 185 (1989). The House Report petitioners cite adds little to

---

[18] The *Jarkesy* Court characterized the OSHA framework as "a detailed building code" rather than any traditional common law cause of action, despite the close relationship between that framework and negligence and wrongful death causes of action. *See* 603 U.S. at 137; *id.* at 178–79 (Sotomayor, J., dissenting); *see also Atlas Roofing*, 430 U.S. at 444–45. We acknowledge that *Jarkesy* called *Atlas Roofing* into question, even if it stopped short of explicitly overruling it, but in the end, *Jarkesy* left *Atlas Roofing* alive, stating that it could "not control here, where the statutory claim is 'in the nature of' a common law suit." *Id.* at 138 (quoting *Atlas Roofing*, 480 U.S. at 461).

No. 23-60617

our analysis because *Jarkesy* requires that we conduct a historical and categorical analysis to determine whether the public rights doctrine applies. One House Report evincing congressional frustration with crowded courts is not enough to overcome the overwhelming history of federal banking regulation and enforcement determined exclusively by the legislative and executive branches.[19] *See Stern*, 564 U.S. at 485.

Our analysis would be incomplete without addressing *AT&T, Inc. v FCC*, No. 24-60223, 2025 WL 2426855, at *1, -- F.4th -- (5th Cir. Aug. 22, 2025), in which we recently held that the Federal Communications Commission's (FCC) enforcement action implicated the Seventh Amendment and was a private right of action. *Id.* at *4–10. The FCC claimed "its enforcement action [fell] within the public rights exception because it involve[d] common carriers." *Id.* at *7. In response, we cautioned against relying on an industry as a whole for the exception to apply, because to do so "would blow a hole in what is meant to be a narrow exception to Article III." *Id.* "Myriad enterprises might be said to implicate the 'public interest,'" we explained, but "[i]f injected into the public rights exception, this . . . would empower Congress to bypass Article III adjudication in countless matters." *Id.* (citation modified). We refused to base the exception on the importance of an industry at large. *See id.*

---

[19] Moreover, just because existing actions in federal court are insufficient to address an issue does not mean that a new type of claim created in response to those inadequacies must also be channeled to Article III. *See Atlas Roofing*, 430 U.S. at 455 ("Congress is not required by the Seventh Amendment to choke the already crowded federal courts with new types of litigation or prevented from committing some new types of litigation to administrative agencies with special competence in the relevant field. This is the case *even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned instead to a federal court of law* instead of an administrative agency." (emphasis added)).

No. 23-60617

The circumstances here are different. First, the FCC had argued that the exception applies to it because it is a common carrier. However, the OCC's position relies on the history of exclusive determination of banking enforcement by the legislative and executive branches. We explained in *AT&T* that "the common carrier doctrine is deeply rooted in the common law" and we considered it to be "bizarre to situate a negligence action against carriers within the 'historic categories of adjudications' falling outside Article III." *Id.* at *7 (quoting *Jarkesy*, 603 U.S. at 130). None of this reasoning is applicable to petitioners' case here. The OCC is not arguing that the federal government simply has an interest in regulating federal banking (as the argument went for common carriers); instead, it contends that the federal banking system is entirely a creature of federal law, crafted from whole cloth by Congress in the middle of the nineteenth century for purposes committed to Congress by the Constitution.

\* \* \*

The banking regulatory regime is relevantly different from the SEC's antifraud provision in *Jarkesy* and from the FCC's framework in *AT&T*. Federal banking enforcement's centuries-long history of exclusive determination by non-Article III branches—and the Supreme Court's repeated confirmation of these principles—bolsters our conclusion. We hold that the public-rights exception applies to federal banking enforcement actions, and that petitioners had no right to a jury trial in this matter.

## B. Appointments Clause

We can quickly dispense with this issue. The Supreme Court decided *Lucia* in the midst of this enforcement action, and the OCC responded by reassigning pending matters to ALJs appointed consistently with *Lucia*'s holding—that an ALJ, as an officer of the United States, must be appointed by the President, a department head, or a court of law. *See Lucia v. SEC*, 585

23

U.S. 237, 244–45 (2018). The OCC reassigned this matter first to ALJ Misendario who retired shortly thereafter, and the matter was taken over by ALJ Whang. Included in the administrative record are various appointment-related documents concerning ALJ Whang's appointment to her position by the then-Secretary of Treasury, Steve Mnuchin. The Treasury Secretary is a department head, and challenges to the constitutionality of ALJ Whang's appointment on *Lucia* grounds are thus meritless. Petitioners' contention that they were denied discovery relating to her appointment is similarly meritless, as the record indicates that all of these materials were available in the proceeding below.

## C. Statute of Limitations

Pursuant to 28 U.S.C. § 2462, there is a five-year statute of limitations for bringing this type of enforcement action, and the clock starts to run on the date the claim "first accrued." A claim accrues when all elements of an actionable claim have been met and can be pleaded. *See Corner Post Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808–09 (2024).

The OCC asserts that its claims first accrued the moment all elements were satisfied. Even if a loan was wrongfully disbursed in 2009, it contends that the claim is not time-barred so long as the effect element occurs within the 5-year window.[20] Petitioners claim that this is unworkable because § 1818(e) provides several different "effects" that the OCC may choose

---

[20] To prohibit someone from the industry pursuant to 12 U.S.C. § 1818(e), the OCC's enforcement counsel must prove misconduct, effect, and culpability. *Proffitt v. FDIC*, 200 F.3d 855, 862 (D.C. Cir. 2000) (collecting cases from the 2d, 3d, and 8th Circuits applying this three-prong analysis). To assess civil penalties, the enforcement counsel must also prove misconduct, effect, and culpability, though the nature of the effect and level of culpability determine the tier of the civil penalty. *See* § 1818(i)(2)(A-C).

from and the agency can simply pick when the claim first accrues.[21] To illustrate their position, petitioners contend that the OCC could have brought some of its claims the moment the Bank issued Capital Raise loans in 2009 because, at that point, "by reason of the . . . [unsafe or unsound] practice," the Bank "will *probably* suffer financial loss or other damage," and/or the depositors' interests "*could* be prejudiced," even though no loss or harm had yet occurred. *See* § 1818(e)(1)(B)(i), (ii).

"It is a familiar principle of statutory construction that courts should give effect, if possible, to every word that Congress has used in a statute." *Conn. Dep't of Income Maintenance v. Heckler*, 471 U.S. 524, 530 n.15 (1985). In *Proffitt v. FDIC*, the D.C. Circuit addressed this very issue: how the statute of limitations from 28 U.S.C. § 2462 applies in the context of § 1818(e)'s alternative grounds on which to base the effect prong. 200 F.3d 855, 863–64 (D.C. Cir. 2000). That court held that to apply "one statute of limitations to all of the alternative circumstances included in section 8(e)(1)(B) . . . would render the 'has suffered' language superfluous" because "[w]henever an institution 'has suffered' financial loss, an action based on the 'will probably suffer' language would have been available before the financial loss in fact occurred." *Id.* It reasoned that beginning the clock the moment of the earliest possible effect would then give no meaning whatsoever to the "has suffered"

---

[21] The OCC is authorized to issue a prohibition or removal order "[w]henever [it] determines that" an institution-affiliated party "engaged or participated in any unsafe or unsound practice," and "by reason of the violation, practice, or breach" one of the following occurs: either (1) the institution "has suffered or will probably suffer financial loss," or (2) the depositors' interests "have been or could be prejudiced." § 1818(e)(1)(A)(ii), (B)(i)–(ii). Not only are there differences between institutional harm and harm to the interests of the depositors, but there are also differences between "has suffered" harm or prejudice and "will probably" suffer harm or prejudice. *See id.* Section 1818(i)'s provisions regarding monetary penalties also contain similar language about loss or the likelihood of loss. *See id.* § 1818(i)(2)(B)(ii)(II).

alternative. *Id.* The court thus held that "[s]eparate accrual for each alternative effect gives meaning to all of the statutory language." *Id.* at 864.

We do not precisely align with the underlying reasoning of the statement that "separate accrual for each alternative effect gives meaning to all of the statutory language." *See id.* The concept of "separate accrual" for the same misdeed—with the effect taking place at a different time—actually undoes the language in 28 U.S.C. § 2462 that the clock begins to run on the *first* accrual. It also provides no clarity to defendants as to when the clock begins to run. *See Adams v. Woods*, 6 U.S. (2 Cranch) 336, 342 (1805) (noting that failure to limit "actions of debt for penalties" would allow those cases to "be brought at any distance of time," which "would be utterly repugnant to the genius of our laws"). Surely, Congress did not intend to undo that clock in amending § 1818(e)'s enforcement actions. "To the contrary, the early running of the statute of limitations seems to me the inevitable price of [the action's] low threshold; the agencies have to take the 'bitter with the sweet.'" *Proffitt*, 200 F.3d at 866. The price of a low threshold is generally the early accrual of the action.

Petitioners also rely on *Gabelli v. SEC* in which the Supreme Court rejected the application of the discovery rule to federal government enforcement actions. 568 U.S. 442, 452 (2013). *Gabelli* involved an SEC enforcement action against an investment adviser for a strategy that took advantage of time delays in the mutual fund system. *Id.* at 446. The SEC brought its action six years after the conduct at issue. *Id.* at 446–47. The Second Circuit applied the discovery rule, tolling the accrual of a claim "until that claim is discovered, or could have been discovered with reasonable diligence, by the plaintiff." *Id.* at 447 (citation modified). The rationale for the doctrine is that victims of fraud may not know that they were defrauded because of actions the defendant took to conceal that fraud. *See id.* at 449.

No. 23-60617

The Supreme Court reversed, distinguishing an enforcement action from the classic application of the discovery rule to "a defrauded victim seeking recompense," although it noted that if the government itself were a fraud victim, as opposed to a regulator seeking civil penalties, the answer might be different. *Id.* at 449–50. The Court reasoned that, "[u]nlike the private party who has no reason to suspect fraud, the SEC's very purpose is to root it out, and it has many legal tools at hand to aid in that pursuit." *Id.* at 451.

Although the Court expressed concern with leaving defendants "exposed to Government enforcement action not only for five years after their misdeeds, but for an additional uncertain period into the future," that language does not require us to agree with petitioners. But *Gabelli* is still helpful. The Supreme Court did not look fondly on making the statute of limitations more lenient on government agencies whose mission and purpose is to detect misconduct and to enforce the law against violators.[22] In our view, *Gabelli* stands for the proposition that the government can detect when a claim accrues more keenly than can the average individual. And it suggests that the government cannot merely wait in the wings until an effect takes place or substantively harms an individual if it knew or determined that the very misdeed causing the harm would "probably" cause such harm down the line. That does not reset the clock.

Instead, we harmonize *Proffitt*, *Gabelli*, and § 1818. *Proffitt* relied on the fact that the statute "expressly authorizes the FDIC to take action

---

[22] The Court observed that the SEC may "demand that securities brokers and dealers submit detailed trading information," mandate that "investment advisers . . . turn over their comprehensive books and records at any time," or even "subpoena any documents and witnesses it deems relevant or material to an investigation" without filing suit. *Id.* at 451. "Agencies often have hundreds of employees, dozens of offices, and several levels of leadership. In such a case, when does 'the Government' know of a violation? Who is the relevant actor?" *Id.* at 452.

27

'whenever' it determines that the statutory prongs are satisfied." 200 F.3d at 864 (majority opinion). In the OCC's view, then, it could start whenever it wants to among those alternatives. We interpret the term "whenever" to mean something stricter: whenever the regulator makes the *determination*, the claim accrues—not whenever/whichever it chooses among the alternatives. *See* § 1818(e)(1) ("Whenever the appropriate Federal banking agency *determines* that . . . . (emphasis added)).

Here, the OCC does not insist that it was unaware of activity that would probably harm the institution. Instead, it focuses on the fact that the statute "provides for multiple types of effects and further provides that certain such effects can be shown, alternatively, at the time they actually occur or when they 'could' or 'will probably' occur." To be clear, petitioners' harmful activity included placing the bank in an uncertain financial position, but all while failing to disclose the true nature of their strategies. We understand this to mean that, at that time, the OCC had not *determined* that petitioners' activity *would probably* harm the bank, which is what triggers the clock.[23]

Neither is there any real showing that the government was, in fact, aware of, and *had determined that*, the activities petitioners undertook would

---

[23] While this may seem facially at odds with *Gabelli*, § 1818's language supports this reading. In *Gabelli*, the statute had the same upon-determination language. *See* 15 U.S.C. § 80b-9(e)(1) ("Whenever it shall appear to the Commission that any person has violated . . . ."). But nowhere in the statute does it set out that the accrual occurs *either* when the misdeed "would probably" or "did" cause harm; instead, the accrual begins *at the violation. Id.* So, it is incumbent upon the SEC to closely monitor individuals' actions, because it has one point from which the claim accrues. Such is not the case in § 1818(e), which predicates the accrual upon the *determination* that either the act will probably or did cause harm. This multipronged focus on effect redirects the accrual starting point from the misdeed itself. The question in § 1818(e) is one of knowledge by the agency that harm could or did occur, not the occurrence of the fraud itself.

harm the bank. At best, petitioners can show that a witness indicated that the unsafe and unsound loans "had an abnormal risk to the bank," "carried potential loss for the bank," and "could prejudice the depositors"—all statements made with the benefit of hindsight. That testimony does not indicate that, at the time the activity occurred, the OCC was aware of it or had made the statutorily-required determination. *See* § 1818(e)(1) ("Whenever the appropriate Federal banking agency *determines* that . . . . (emphasis added)).

Petitioners also challenge the timeliness of the accounting-related charges and characterize the OCC as penalizing the failure to correct an error that occurred more than five years prior. But the Notice of Charges states that petitioners filed "materially inaccurate Call Reports" up and "through the Call Report for the quarter ending June 30, 2013." We therefore disagree with petitioners that this case involves the "continuing violations" doctrine. The misconduct the OCC identified was not a failure to correct a prior error, but the repeated filing of materially inaccurate information with each successive Call Report, with those inaccuracies building on one another with each new filing. In a case addressing almost this precise issue, the D.C. Circuit explained that "even though the OCC 'might well have brought an action earlier,' its 'failure to do so' does not make the claims it elected to bring 'untimely.'" *Blanton v. OCC*, 909 F.3d 1162, 1172 (D.C. Cir. 2018) (quoting *Proffitt*, 200 F.3d at 864); *see also id.* ("As a result, each time the Bank, under Blanton's direction, honored a Campos overdraft without having imposed adequate risk controls, an unsafe or unsound banking practice occurred, continuing the pattern of misconduct and causing a new claim to accrue.").

The claims are not time-barred.

## D. Trial Errors

Petitioners appeal three trial errors that they say require reversal: (1) the ALJ's exclusion of Fannie Mae and Freddie Mac evidence; (2) the

No. 23-60617

ALJ's refusal to allow offers of proof; and (3) admission of depositions from witnesses who were not cross-examined.

Petitioners first contend that the ALJ should have allowed evidence relating to Fannie Mae and Freddie Mac because, they say, the government's pre-crisis encouragement to invest in those assets sheds light on petitioners' culpability and the credibility of government witnesses. But the ALJ excluded petitioners' exhibits on the grounds that they were repetitive and irrelevant to the charges at issue, and the Comptroller adopted this finding *after* "review[ing] [petitioners'] additional offer of proof." Regulations permit the Comptroller to perform any act that the ALJ could have performed, and allow the ALJ to avoid undue delay by, for example, refusing to admit repetitive and cumulative evidence. *See* 12 C.F.R. §§ 19.4-19.5. That the Comptroller reviewed petitioners' proffers also refutes their second contention regarding the ALJ's purported refusal to entertain offers of proof, since any failure by the ALJ to review this information is neutralized by the Comptroller's consideration of it before issuing his final decision.

Finally, petitioners allege hearsay and evidentiary violations, but the Comptroller found those objections, if not deemed waived, to be "not well taken," observing that petitioners' exception on this issue "largely consist[ed] of conclusory bullet points with no meaningful analysis or citation to supporting authority."

On this record, substantial evidence exists to support the agency's actions and findings, so we do not disturb them. *Girling Health Care, Inc.*, 85 F.3d at 215 ("Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Richardson*, 402 U.S. at 401)).

E. Prohibition Order

Petitioners contend that the Comptroller erred when he rejected the ALJ's conclusion that there was not enough culpability to support the prohibition orders. "[I]n cases in which the ALJ and the [Comptroller] reach contrary conclusions, we determine whether the [Comptroller] sufficiently articulated reasons for rejecting the ALJ's findings or conclusions." *Grubb*, 34 F.3d at 961.

To support prohibition, enforcement counsel must show a scienter "well beyond mere negligence." *See Kim v. OTS*, 40 F.3d 1050, 1054 (9th Cir. 1994). This culpability may be shown by evidence of a "continu[ed] disregard" for the safety and soundness of the bank. 12 U.S.C. § 1818(c)(1)(C). Courts have looked for "a mental state akin to recklessness." *Kim*, 40 F.3d at 1054 (citation modified); *see also Grubb v. F.D.I.C.*, 34 F.3d 956, 961–62 (10th Cir. 1994) (defining "continuing disregard" as "conduct which has been voluntarily engaged in over a period of time with heedless indifference to the prospective consequences" (citation modified)).

The prohibition orders stemmed from misconduct related to the Capital Raise Strategy. The ALJ had found that enforcement counsel failed to prove this element and that "there [was] substantial evidence—backed by credible testimony—that Respondents found themselves in a difficult and exigent situation with no good solutions and that their actions were motivated by a good faith concern for the Bank and its depositors during a time of crisis." Finding not enough to show reckless or heedlessly indifferent conduct, the ALJ declined to prohibit petitioners on the basis of the Capital Raise Strategy.

Enforcement counsel objected, contending that petitioners approved dozens of Capital Raise Loans despite knowing the true purpose of such loans, contemporaneously knew that the loan packages misled the L&D

Committee, and were telling the OCC that no lending was occurring. They asserted that this demonstrated heedless indifference. The Comptroller agreed and found the ALJ's recommendation against prohibition to be "internally inconsistent" because, although the ALJ had found that petitioners employed "demonstrably deceptive practices," engaged in "habitual inattention," and "raised sham capital using the Bank's existing funds," the ALJ had also found that they were acting in good faith. The Comptroller deemed it concerning that, during that time, "despite being in virtually continuous contact with the OCC and under an obligation to be fully transparent about the Bank's capital-raise efforts," petitioners "participated in concerted efforts to conceal or misrepresent the Capital Raise Strategy to the OCC and in Bank records."

There was a plethora of evidence in the record to show that petitioners knew contemporaneously that their conduct in the Capital Raise Strategy was not above board, and the Comptroller "sufficiently articulated reasons for rejecting the ALJ's findings or conclusions" on the prohibition orders. *See Grubb*, 34 F.3d at 961.

## F. Prohibition Standard

Petitioners complain that, because prohibition is such a severe sanction, the preponderance of the evidence standard implicates Due Process, and that the OCC should have used the clear and convincing evidence standard. But we already determined that the preponderance standard is "the appropriate standard under 5 U.S.C. § 556(d)" for a banking regulator to order prohibition pursuant to § 1818(e)(1). *Lewis v. FDIC*, No. 99-60412, 2001 WL 184841, at *2 (5th Cir. Feb. 2, 2001) (citing *Steadman v. SEC*, 450 U.S. 91, 94 (1981)). Although the *Lewis* opinion is unpublished, it is still persuasive. *Mirelez v. State Farm Lloyds*, 127 F.4th 949, 951 (5th Cir. 2025). In any event, the Supreme Court has instructed that the preponderance standard is

appropriate in civil administrative proceedings, including when the sanctions imposed "include[] an order permanently barring an individual from practicing his profession." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389–90 (1983) (discussing the facts of *Steadman*).

## IV. Conclusion

The petition for review is DENIED.